**In re KEYSPAN CORPORATION SECURITIES LITIGATION**

**No. 01 CV 5852(ARR).**

United States District Court, E.D. New York.

March 21, 2003.

Mark D. Smilow, Weiss & Yourman, New York, NY, Steven Cauley, Cauley Geller Bowman & Coates, LLP, Little Rock, AR, for Lead Plaintiffs.

Michael J. Chepiga, Simpson Thacher & Bartlett, New York, NY, for defendant KeySpan.

Robert J. Higgins, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, for defendants Catell, et al.

## OPINION AND ORDER

ROSS, District Judge.

The lead plaintiffs in this action represent a proposed class of persons who purchased stock in defendant KeySpan Corporation ("KeySpan," or "the Company") between November 4, 1999, and January 24, 2002. By the Consolidated Class Action Complaint ("the complaint"), filed May 13, 2002, plaintiffs allege that defendants, KeySpan and 13 of its most senior officers and directors ("the individual defendants"; collectively with KeySpan, "defendants"), violated Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 of the regulations promulgated thereunder, 17 C.F.R. § 240.10b–5. Plaintiffs further allege that the individual defendants, by virtue of their status as controlling persons in the Company, are liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs also assert claims against the individual defendants for insider trading in violation of Section 20A of the Exchange Act, 15 U.S.C. § 78t–1(a). Defendants have moved to dismiss the complaint pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure and pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, *et seq.* For the reasons below, the motion is granted, except insofar as it seeks a denial of leave to replead.

## BACKGROUND

The Consolidated Class Action Complaint alleges the following facts. Plaintiffs are purchasers of KeySpan stock during the class period, which runs from November 4, 1999, to January 24, 2002. Defendant KeySpan is the largest investor-owned energy utility company in New York, a registered holding company under the Public Utilities Holding Company Act of 1935 ("PUHCA"), a member of the Standard & Poor's 500 Index, and the manager of a portfolio of subsidiary service companies. The individual defendants—Robert B. Catell, Craig G. Matthews, Gerald Luterman, Stephen L. Zelkowitz, Robert J. Fani, William K. Feraudo, Wallace P. Parker, Cheryl Smith, Lenore F. Puleo, David Manning, Elaine Weinstein, Lawrence S. Dryer, and Colin P. Watson—were the most senior executives at the Company during the class period. Defendant Catell was the Chairman of the Board of Directors; Defendant Matthews was Vice Chairman.

In broad outline, the complaint alleges that defendants artificially inflated the price of KeySpan stock during the class period by concealing the negative effects of two of the Company's recent acquisitions, Roy Kay, Inc., and Midland Enterprises, a division of Eastern Enterprises. Plaintiffs allege that defendants failed to reveal that as a result of KeySpan's November 1999 merger with Eastern, a New England-based energy company, the Company would be subject to regulation under PUHCA. This regulation, in turn, would require the Company to divest certain non-utility businesses, such as Midland, a barge and shipping company, as well as a significant portion of Roy Kay, a construction firm, 30 percent of whose business

consisted of non-energy-related general contracting. With respect to Roy Kay, the complaint also alleges that defendants hid from investors massive operational and accounting problems Roy Kay was having, problems that eventually cost the Company more than $100 million. The complaint alleges that the difficulties at Roy Kay, as well as the consequences of KeySpan's regulation under PUHCA, constitute material information of which investors should have been made aware. Plaintiffs allege that the individual defendants fraudulently concealed this information for personal gain, as evidenced by their selling a high volume of their own shares of Company stock during the class period—i.e., before the release of the negative information to the public.

## I. Materially False and Misleading Statements

### A. Acquisition of Eastern Enterprises

On November 4, 1999, KeySpan announced that it had entered into an agreement to acquire Eastern Enterprises. KeySpan represented that savings from the merger would come to $24 to $29 million annually. The complaint alleges that these figures were materially false and misleading because defendants did not inform investors that as a result of the merger, KeySpan would be subject to the strictures of PUHCA. Regulation under this act would negatively affect the Company—and in fact, would entirely offset the projected savings—by (1) restricting transactions among KeySpan and its affiliates and (2) limiting the Company's ability to enter into businesses not directly engaged in the energy utility business. As

for the latter, the complaint alleges that, in particular, the Company knew and failed to disclose that PUHCA would require the divestiture of Midland, as well as of a significant portion of Roy Kay, which at that time the Company was in the process of acquiring.

### B. Acquisition of Roy Kay

On February 4, 2000, KeySpan announced its acquisition of three engineering and construction contracting companies in the New York metropolitan area, including Roy Kay. In a press release that day, defendant Catell is quoted as follows: "These acquisitions are consistent with KeySpan Energy's aggressive strategy to expand our home-energy and business-solutions companies. Our goal is to become the premier energy company in the Northeast and this is a major step to achieving that goal." Compl. ¶ 67; see also Def. Ex. 6 (full text of press release). Catell further stated:

> The acquisitions are key to achieving the earnings goals set for this year. KeySpan will build on the impressive credentials and formidable reputations of our new subsidiaries.... The fit is a natural. We supply developers as well as established commercial, industrial and residential customers with engineering, design, construction, financing, their fuel of choice and the energy management services they want and need.

Id. In addition to the foregoing information, the Wall Street Journal reported on February 4, 2000, that KeySpan expected the three acquisitions to provide as much as 20 percent of the Company's profits within five years. Id. ¶ 64.[1]

---

1. The complaint and plaintiff's memorandum of law in opposition to defendants' motion to dismiss imply, incorrectly, that this prediction also appears in the February 4, 2000 press

release, a copy of which defendants have attached to their motion. Compl. ¶ 65; Pl. Mem. at 6–7. Plaintiffs do not object to the court's consideration of this document for

Plaintiffs allege that the Company's statements regarding its acquisition of Roy Kay were false and misleading for several reasons. First, plaintiffs assert that the statements omitted the fact that, as a result of the Eastern merger, the Company would soon be subject to PUHCA. As discussed, regulation under PUHCA allegedly would have a negative impact on the profitability of the Roy Kay acquisition by requiring the termination or divestiture of Roy Kay's general contracting activities—30 percent of its total business—and by limiting the ability of Roy Kay to provide services to KeySpan affiliates.

Plaintiffs further allege that the Company's February 4 statements misled investors by concealing major problems with Roy Kay's business. These problems, which the complaint alleges defendants knew of or recklessly ignored, included Roy Kay's failure to perform several large construction contracts on time and within budget, and developers' threats of action as a result thereof. In plaintiffs' words, "[a]nything but the most reckless due diligence would have uncovered the financial and operational problems that existed at Roy Kay at the time of the acquisition." Compl. ¶ 71. Ultimately, KeySpan would be forced to assume upwards of $100 million in liability from Roy Kay's derelictions, well in excess of the $20 million KeySpan paid to acquire Roy Kay itself.

Additionally, the complaint alleges that the February 4 statements fraudulently concealed the fact that Roy Kay lacked an accounting system and a system of internal control at the time of the acquisition. Lastly, the Company's reported statement that the new acquisitions would contribute to 20 percent of its profits within five years is alleged to have been false and misleading inasmuch as it was made without any reasonable, good faith basis.

## C. March 24, 27; April 26; and May 12 2000 Statements

In a March 24, 2000 press release and in a Form 8–K filed with the Securities and Exchange Commission ("SEC") on March 27, 2000, the Company reported that its first quarter earnings for the year were "significantly ahead of analysts' estimates" and that earnings for the entire year 2000 could likewise exceed estimates. Compl. ¶ 81. Plaintiffs allege that defendant Catell "specifically attributed the higher numbers to success in implementing the Company's growth strategy"; in support of this allegation, plaintiffs point to Catell's statement that KeySpan's " 'dividend yield and earnings growth are superior to respective industry groups and make us confident of increasing long-term value for our shareholders.' " Id. Regarding the merger with Eastern, Catell was equally sanguine, stating, "We are confident that we will exceed our goal of achieving $30 million in synergy savings and are hoping to achieve a level of savings that will make the merger non-dilutive in the first full year." Id.

On April 26, 2000, KeySpan issued a press release reporting its consolidated earnings for the first quarter of 2000. The release indicated that earnings were 30 percent greater than the previous year's. On May 12, 2000, the Company filed with the SEC a Form 10–Q for the period ending March 31, 2000. The filing contained the same information regarding earnings as the April 26 press release, and also reported that the Company's assets had increased by approximately $200 million in its energy-related services because of its recent acquisitions, including that of Roy Kay. Additionally, KeySpan disclosed

purposes of deciding the instant motion, but do object to its consideration of numerous

other documents defendants have submitted. This dispute is discussed at length below.

that following the closing of the Eastern acquisition, expected to take place in 2001, the Company would be subject to regulation under PUHCA. However, plaintiffs allege that KeySpan did not disclose the negative effect that such regulation would have on the Company.

The complaint alleges that these statements regarding earnings were false and misleading for two sets of reasons. First, "KeySpan had no reasonable basis for reporting such earnings, as its earnings were jeopardized throughout the entire period because KeySpan failed to properly account for the continuing and mounting contract losses associated with the Roy Kay general contracting operations." Compl. ¶ 83; *see also id.* ¶ 85. The complaint asserts that KeySpan also failed to disclose "that Roy Kay operated without proper accounting controls and with substantial unrecorded liabilities that exceeded the entire cost of that acquisition." Compl. ¶ 85. Plaintiffs allege that Roy Kay's financial troubles were material to almost the entire quarter given that the Company acquired Roy Kay in January 2000.

The second reason plaintiffs assert as to why the statements were misleading is that they concealed the negative effects of the Company's impending status as a PUHCA-regulated holding company. As described above, plaintiffs allege that the Company did not disclose that under PUHCA, KeySpan would be (1) forced to divest its non-energy-related businesses "at a substantial and material cost," *id.* ¶ 85; and (2) prohibited from having its affiliates provide services to one another.

### D. July 12, 26; August 10; and October 24, 31, 2000 Statements

On July 12, 2000, the Company filed a Form 8–K reporting the unaudited consolidated financial statements of the combined KeySpan–Eastern as of the quarter ended March 31, 2000, and for the calendar year 1999. On July 26, in a press release and in another Form 8–K, KeySpan reported its earnings for the second quarter of 2000. The Company indicated that its earnings were up from the same quarter in 1999, as were its profits from its energy-related-services sector. On August 10, the Company filed a 10–Q with the SEC, affirming the financial results announced on July 26. On October 24, 2000, the Company issued a press release reporting its third quarter earnings, which again were greater than those of the same quarter in 1999. Finally, on October 31, 2000, the Company filed its third-quarter 10–Q form, confirming the October 24 results. The 10–Q also discussed the merger agreement between KeySpan and Eastern. In particular, the form noted that the merger would subject KeySpan to PUHCA and that, as a result, its corporate and financial activities, including its ability to pay dividends, would be subject to SEC regulation. The 10–Q also stated that the merger was conditioned on approval by, *inter alia,* the SEC.

The complaint alleges that all of the above statements were fraudulent for the same reason. With respect to each report and press release, plaintiffs assert that it "was materially false and misleading because it made no mention of [an] application [the Company had made with the SEC] to retain [its] non-utility activities after the Eastern acquisition and failed to properly disclose and account for the troubled Roy Kay operations and the resulting jeopardy to [KeySpan's] reported and future earnings." Compl. ¶ 90; *see also id.* ¶¶ 86–89. The SEC application plaintiffs refer to is a filing under PUHCA, which in certain circumstances requires the divestiture of holdings not related to a public utility's core operations.

### E. November 9, 2000

On November 9, 2000, the Company reported that it had consummated its merger

with Eastern. In a press release issued that day, Robert Catell stated that "KeySpan anticipates tremendous growth for regulated and unregulated sales of natural gas and energy-related products and services throughout the region." Compl. ¶ 91. The report stated that the acquisition increased the Company's customer base, and that because market saturation for natural gas in the Northeast was low, "the area provides opportunities for significant growth in KeySpan's regulated gas business." *Id.* The press release also reported that KeySpan expected the acquisition to yield pre-tax savings of approximately $40 million per year.

The complaint alleges that the press release was materially false and misleading because, yet again, it failed to mention that Eastern's Midland subsidiary "would be ordered divested by the SEC, which had expressly retained jurisdiction regarding that issue." Compl. ¶ 92. The failure to disclose the Midland situation rendered the estimate of $40 million in savings a falsity because "the Company failed to properly disclose or account for the uncertainty related to the loss contingency for the required disposal of Midland. The loss contingency, at a minimum, should have been disclosed in the notes to the financial statements at December 31, 2000." *Id.* Rather, the complaint alleges, KeySpan did not make these disclosures until the second quarter of 2001, and did not take a write-off of Midland until the fourth quarter of 2001. Plaintiffs assert that this manner of accounting for the Midland transaction violated the GAAP[2] requirements of Financial Accounting Standards ("FAS") 5, entitled "Accounting for Contingencies," and the requirements of Accounting Principles Board ("APB") 16 and FAS 38; these standards "required KeySpan to disclose that the allocation of the

purchase price was preliminary due to the uncertainty related to the Midland divestiture." *Id.* Finally, plaintiffs allege that the Company did not identify Midland as a discontinued operation in the notes to its December 31, 2000 statements, despite having full knowledge at that time of the required divestiture.

### E. January 25 and March 30, 2001 Statements

On January 25, 2001, KeySpan issued a press release and filed a Form 8–K reporting its fourth quarter income as well as its consolidated earnings for fiscal 2000. The Company noted that its subsidiary, KeySpan Services, Inc., had recorded its first annual profit, and that its energy-management businesses had achieved their anticipated level of profitability. Additionally, the Company emphasized the successful completion of the Eastern merger. The complaint excerpts the following passage from the press release:

> Looking to the future, Mr. Catell said, "We have a sound strategy and a strong foundation for future earnings growth. All our businesses have a positive outlook and should be able to build upon this year's strong performance. Conversions from oil to natural gas in New England and on Long Island are expected to continue at a healthy pace. We maintain a rigorous budget process to control costs and expect to achieve our synergy savings target. As a result, we expect to earn between $2.60 to $2.65 per share in 2001. We will keep our shareholders abreast of any changes to this earnings forecast which may arise from factors including the level of gas prices, winter weather patterns, and

**2.** GAAP stands for Generally Accepted Accounting Principles.

the demand for electricity this summer".

Compl. ¶ 94.

On March 30, 2001, the Company released its annual 10–K form for 2000, which repeated the consolidated earnings information provided on January 25. The form included Midland's operations in the financial results "even though KeySpan partially disclosed that Midland's operations were determined not to be functionally related to KeySpan's core utility operations as required by PUHCA and the SEC ordered divestment of Midland by November 8, 2003." Compl. ¶ 96.

Plaintiffs claim that the foregoing reports were false and misleading for the same two general reasons as all of the other reports made during 2000: the failure to properly disclose and account for the losses from the troubles at Roy Kay and from the impending divestiture of Midland. In the alternative, plaintiffs allege that these reports were false because of "KeySpan's failure to disclose that its purchase price allocation was preliminary with respect to the Eastern acquisition due to the uncertainty regarding the forced divestiture of Midland," and because KeySpan failed to disclose similar "accounting uncertainties [related to] the inevitable divestiture of the general contracting business at Roy Kay." Compl. ¶ 95; Pl. Mem. at 14. In light of KeySpan's nondisclosure of these losses—or, alternatively, these "accounting uncertainties"—the reported annual profit of $40.9 million is alleged to have been fraudulent, as are Catell's statements that the Company maintained a rigorous budget process and that all business segments retained a positive outlook.

### F. April 26, May 7, and June 25, 2001 Statements

On April 26 and May 7, 2001, the Company reported record earnings for the first quarter of 2001. In light of these results, the Company increased its earnings forecast for the year 2001. In addition, the Company stated that KeySpan Services, Inc., the subsidiary that owned Roy Kay, had earnings before interest and taxes ("EBIT") of $2 million. The complaint alleges that these reports were false and misleading because, as a result of the undisclosed problems at Roy Kay, KeySpan actually had a first quarter loss of $5.5 million, which the Company did not reveal until October 24, 2001. The complaint further alleges that "KeySpan has also failed to restate its previously issued financial statements in order to reflect the combined losses of approximately $100 million that were revealed on July 17, 2001, and October 24, 2001, related to the Roy Kay operations." Compl. ¶ 105. In addition, the April and May statements are also alleged to be false because of their failure to disclose the impending Midland divestiture and the likely losses therefrom.

On June 25, 2001, the Company announced the promotion of defendants Fani, Zelkowitz, and Parker, and further announced that it was combining its unregulated business into KeySpan Energy and Services and Supply, and its regulated businesses into KeySpan Energy Delivery. The Company stated that these actions were "consistent with the evolution of [KeySpan's] organizational structure" and would enable the Company "to implement [its] growth strategy." Compl. ¶ 107. Plaintiffs allege that these announcements, like the others, fraudulently concealed the threat to earnings from the negative situation at Roy Kay and the impending divestiture of Midland.

### G. July 17, 2001 Statements

On July 17, 2001, the Company issued a press release and filed a Form 8–K with

the SEC announcing that it would take a special charge in the second quarter of $30 million after tax in its energy services division as a result of problems at Roy Kay. The Company reported that the charge reflected unanticipated costs stemming from Roy Kay's failure to complete certain construction projects, as well as from inaccuracies discovered in Roy Kay's books. KeySpan announced that it had replaced the management of Roy Kay and initiated litigation against them seeking to recover damages. Defendant Catell stated, "The performance of the Roy Kay companies under their former management was not commensurate with the high standards demanded by KeySpan." Compl. ¶ 109. Catell stated that the Company was, however, "confident that [its] other acquisitions are performing within expectations. Accordingly, our strategy for building our Energy Services business remains intact." *Id.* In a conference call that same day, defendant Luterman stated that KeySpan had been aware of the situation at Roy Kay since April 2001, but had not "put [its] hand around the size and scope of it" until July. Compl. ¶ 112. On July 26, 2001, the Company issued another press release and filed another Form 8–K reporting substantially the same message: that the Company was forced to take a special charge because of problems at Roy Kay but was otherwise well positioned for growth.

The complaint alleges that these statements were fraudulent for two reasons. First, plaintiffs contend that Luterman's statement that the Company had not fully appreciated "the size and scope" of the problems at Roy Kay until July 2001 was false because KeySpan in fact knew of, or recklessly disregarded, these problems from the time it acquired Roy Kay in 1999. Plaintiffs allege that "[a]nything but the most reckless due diligence" would have discovered these problems, which included cost overruns and substantial delays in several construction projects, public conflicts with unions, and a "general reputation as a shoddy contractor." Compl. ¶ 114. Plaintiffs cite additional problems at Roy Kay after the acquisition, and allege that defendants knew of or recklessly disregarded these as well.

Second, plaintiffs allege that the July reports were misleading because they failed to disclose the true amount of the loss attributable to Roy Kay. Only on October 24, 2001, did the Company reveal that, because of Roy Kay, it would have to take an additional $56.6 million after-tax charge, and that it had incurred a $5.5 million loss in the first quarter of 2001. Moreover, KeySpan has never restated its first quarter earnings, as required by GAAP.

## H. August 13, 2001 Statements

On August 13, 2001, the Company filed its Form 10–Q for the second quarter of 2001, reporting the $30 million after-tax charge attributable to Roy Kay. Plaintiffs repeat their allegation that this report was fraudulent for failing to provide the true measure of the losses, which was not disclosed until October. Plaintiffs also reiterate that this filing violated GAAP because it "did not restate the losses to the previously reported financial statements." Compl. ¶ 118. The complaint alleges, "This should not have been recorded as a special charge under proper contract accounting, as changes in estimates are required by GAAP to be included as part of normal operating income. The fact that it was designated as a special charge affirms Lead Plaintiffs's [sic] allegation that the amount was a correction of an error related to previously issued financial statements." Compl. ¶ 119.

The August 13 10–Q form also informed shareholders of the forced divestiture of Midland, which the SEC had ordered to be consummated by November 8, 2003. The Company stated that the purchase price allocation of Midland was preliminary, and that the adjustment to reflect its fair value at the purchase date would be made, probably by November 8, 2001. Although plaintiffs acknowledge that the 10–K form for the period ending December 31, 2000, disclosed the forced divestiture of Midland, they allege that this disclosure was "buried" and that, in any event, it did not state that the allocation of the purchase price was preliminary. As described above, plaintiffs allege that the nondisclosure of the uncertainty regarding the purchase price violated GAAP. Moreover, plaintiffs assert, under SEC rules KeySpan's failure to disclose this uncertainty in its filing for December 31, 2000, precluded its subsequent reallocation.

### I. October 23 and 24; November 14, 2001 Statements

In a press release issued October 23, 2001, a Form 8–K filed the next day, and a Form 10–Q filed November 14, 2001, the Company announced break-even results for the third quarter of 2001, excluding a special after-tax charge of $56.6 million stemming from problems at Roy Kay. The Company announced that it was discontinuing Roy Kay's general contracting activities, because these were deemed "no longer consistent with [the Company's] core competencies, strategic focus and risk profile." Compl. ¶ 125. The Company reported that the special charge reflected unanticipated costs of completing certain construction projects, quarterly operating losses, and the costs associated with discontinuing construction operations altogether, such as the write-off of goodwill.

The complaint alleges that these disclosures were materially false and misleading because the Company "did not restate the First Quarter for this loss or the $30.1 million loss announced on July 17, 2001, nor did it restate its First Quarter earnings to reflect the $5.5 million operating loss due to the Roy Kay operations." Compl. ¶ 126.

### J. December 6, 2001 Statements

On December 6, 2001, the Company issued a press release stating that KeySpan "affirmed its commitment to divest or monetize its non-core assets in 2002, including its Midland in-land barge business." Compl. ¶ 129. The complaint alleges that this statement was false for failing to disclose that KeySpan would record, on January 24, 2002, a $30.4 million dollar after-tax loss based on the forced sale of Midland. Plaintiffs allege that only on January 24, 2002, the end of the class period, did the Company reveal "all of the information previously withheld from investors," that is, the full extent of the losses related to Midland and Roy Kay. Pl. Mem. at 22; Compl. ¶ 139.

### II. Scienter

Plaintiffs allege that defendants acted with scienter in issuing the foregoing statements and financial results insofar as the individual defendants deliberately provided false information to the investing public in order to maintain KeySpan's share price at an artificially high level. Plaintiffs allege that the individual defendants' fraudulent intent is revealed by the large amount of sales of KeySpan stock they sold during the class period. Plaintiffs allege that during the class period, the individual defendants either "(a) acquired shares via exercise of options and liquidated all or substantially all of those holdings, or (b) liquidated all or substantially

all of their currently owned shares." Compl. ¶ 150. Plaintiffs assert that these sales, which resulted in proceeds to the individual defendants of nearly $60 million,[3] were out of the ordinary and amounted to illegal insider trading. The fact that none of the individual defendants had sold their personal stock in the prior year is alleged to provide evidence of the impropriety of the trades, as is the fact that the volume of sales peaked in May 2001, "just prior to the July 17, 2000 announcement of the adverse disclosure of KeySpan's $30.1 million charge to earnings." Compl. ¶ 153. Plaintiffs also allege that the SEC initiated an investigation into insider trading by individual KeySpan officers before the July 17,2001 announcement of losses related to Roy Kay. The SEC had begun a preliminary investigation by November 14, 2001, and commenced a formal investigation on March 25, 2002.

Plaintiffs further allege that defendants, who were the most senior officers and directors of KeySpan, knew of the falsity of their public statements and filings by virtue of their positions in the Company. The complaint states, "The Individual Defendants controlled and/or possessed the power and authority to control the contents of KeySpan's Registration Statements, its Form 10–K SEC filings, and quarterly and annual reports and press releases, and were provided copies of the filings, reports and releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to present [*sic*] their issuance and/or cause them to be corrected." Compl. ¶ 147. As detailed above, the complaint alleges that throughout the class period defendants knew of or recklessly disregarded—yet deliberately concealed from the public—the losses that would re-

sult from the Midland divestiture and the problems at Roy Kay. As for the latter, plaintiffs allege that documents disclosed in the Company's litigation against Roy Kay in Monmouth County, New Jersey, reveal that before acquiring Roy Kay, defendants knew that Roy Kay's construction operations were a substantial part of its business. Nevertheless, the complaint alleges, defendants completed the acquisition even though it was a substantial certainty that the Eastern merger, and the resulting PUHCA regulation, would require divestiture of these operations. Moreover, as described above, plaintiffs allege that the myriad problems at Roy Kay were known to the Company at the time of its acquisition, and in any event well before the July 17, 2001 disclosure; in partial support of this allegation, plaintiffs attach to the complaint several letters to Roy Kay from parties claiming that it had defaulted on its contractual obligations or otherwise engaged in improprieties.

### III. Additional Allegations

As mentioned, the complaint alleges that defendants' treatment of the Roy Kay and Midland situations violated GAAP. The complaint contains a separate section entitled "Violations of GAAP," which in addition to the particular violations outlined above, alleges a variety of other accounting irregularities. In sum, these allegations contend that defendants' financial statements violated accepted accounting principles because they "did not timely reflect the losses incurred during the Class Period." Compl. ¶ 175.

The complaint asserts that plaintiffs' reliance on defendants' misstatements can be established by the fraud-on-the-market doctrine. Plaintiffs allege facts purporting to establish that KeySpan's securities were

---

**3.** The complaint contains a chart with the dates and amounts of each individual defen- dant's sales during the class period. Compl. ¶ 150.

traded in an efficient market, that the market promptly digested information regarding KeySpan from all publicly available sources, such as those containing the statements enumerated in the complaint, and that these statements had the effect of creating an unrealistically positive public assessment of KeySpan's financial situation, an assessment reflected in the Company's overinflated stock price. Under the circumstances, plaintiffs allege, it is right to presume that plaintiffs relied on defendants' public misrepresentations in purchasing KeySpan stock.

### IV. Procedural History

On November 27, 2001, Magistrate Judge Go ordered the consolidation of four actions against defendants, the first of which had been filed on August 28, 2001. All four of these actions focused on the financial and operational difficulties at Roy Kay, and alleged a class period ending July 17, 2001. On May 13, 2002, plaintiffs filed the Consolidated Class Action Complaint, which reiterates the charges concerning Roy Kay and adds the allegations related to the acquisition of Eastern Enterprises and the resultant forced divestiture of non-core businesses under PUHCA. The consolidated complaint alleges a class period extending from November 4, 1999, to January 24, 2002.

In the instant motion, which was filed fully briefed on February 7, 2003, defendants raise several grounds for dismissal. Defendants argue that the complaint (1) fails to state a claim for securities fraud in connection with defendants' alleged concealment of its regulation under PUHCA, inasmuch as defendants actually made public both this regulation and its foreseeable consequences; (2) fails to allege sufficient facts to state a claim regarding defendants' statements and omissions about Roy Kay; (3) fails to allege sufficient facts

to create a strong inference of scienter; (4) improperly seeks to attach liability to inactionable general statements of corporate optimism and forward-looking statements; (5) fails to state a claim under either Section 20(a) or Section 20A of the Exchange Act; and (6) fails to comply with either Rule 8 of the Federal Rules of Civil Procedure or the PSLRA inasmuch as it consists of vague, convoluted "puzzle pleading." Defendants further argue that the complaint should be dismissed without leave to replead.

## DISCUSSION

### I. Legal Standards

#### A. Fed.R.Civ.P. 12(b)(6)

Under Rule 12(b)(6), a case should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As it decides a defendant's motion to dismiss, "the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,* 128 F.3d 59, 63 (2d Cir.1997). The central question is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

#### B. Section 10(b) and Rule 10b–5 of the Exchange Act and Fed. R.Civ.P. 9(b)

■ "To state a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance

on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996); *see also Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir.2000) ("Section 10(b) ... bars conduct involving manipulation or deception, manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive.") (citation and internal quotation marks omitted).

■ Under the PSLRA, a plaintiff pleading a violation of Section 10(b) and Rule 10b–5 must "specify each statement alleged to have been misleading, the reason or reasons the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir.2001). Rule 9(b) of the Federal Rules of Civil Procedure also requires that the circumstances of the alleged fraud be stated "with particularity." Fed.R.Civ.P. 9(b). In the securities fraud context, Rule 9(b) requires that "[t]he complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." *In re Scholastic Corp.*, 252 F.3d at 69–70 (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

A plaintiff must also allege that the fraudulent statement or omission that the defendant had a duty to disclose was material. The Second Circuit recently summarized the standard for pleading materiality as follows:

At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (adopting the standard in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for §§ 10(b) and Rule 10b–5 actions); *Glazer v. Formica Corp.*, 964 F.2d 149, 154–55 (2d Cir.1992). " '[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126, 48 L.Ed.2d 757).

*Ganino*, 228 F.3d at 161–62.

■ Finally, the complaint must allege that the defendant made the material misstatement or omission with scienter, or " 'an intent to deceive, manipulate or defraud.' " *Ganino*, 228 F.3d at 168 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Under the PSLRA, the complaint must plead facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001). A plaintiff satisfies this standard " '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Kalnit*, 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)); *see also Novak v. Kasaks*, 216 F.3d 300, 310–11 (2d Cir.2000) (explaining that PSLRA adopted the "strong inference"

standard developed in prior Second Circuit caselaw).

### C. Documents Considered by the Court in Deciding the Instant Motion

■ As a threshold matter, the parties dispute which documents the court may consider in deciding defendants' motion. Defendants have appended voluminous exhibits to their motion, including the full text of many of the press releases and SEC filings referred to in the complaint. Plaintiffs have no apparent objection to most of these, including the press releases and the Forms 8–K, 10–K, and 10–Q. However, among the SEC filings defendants attach are documents filed pursuant to defendants' obligations under PUHCA. It is to these "utility regulatory postings"—the term is plaintiffs'—that plaintiffs object. Pl. Mem. at 33.

■ As a general rule, of course, a court deciding a motion to dismiss may consider only the allegations of the complaint itself, together with any documents attached to it or explicitly incorporated by reference therein. *See Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985). In securities fraud cases, however, a court may consider "public disclosure documents required by law to be, and that have been, filed with the SEC . . ., and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citations omitted); *see also Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991).

Plaintiffs contend that the court may not consider documents KeySpan filed with the SEC pursuant to PUHCA, such as the U–1 forms, because these forms are not "public disclosure documents." Rather, plaintiffs assert, they are mere regulatory postings. As such, plaintiffs argue, the documents were never made "available to the investing public by dissemination in a manner calculated to reach investors and the securities market place in general through recognized channels of distribution." Pl. Mem. at 33. Plaintiffs acknowledge that the forms were "technically filed with the SEC and may have been available to persons possessing or having access to a personal computer with Internet hookup," *id.* at 34, but they contend that such electronic availability is insufficient to bring the documents into the category of securities filings the court may consider. This is allegedly because defendants never specifically mentioned the forms in any of their standard (i.e., non-PUHCA) SEC filings, nor did they otherwise disseminate the forms to the investing public, such as by direct mail or press release.

The court is unpersuaded by this reasoning. The PUHCA filings in question fall within the letter and the spirit of the Second Circuit's pronouncements on what documents a district court may consider at the pleading stage of a securities fraud action. The court fails to see how the U–1 and other PUHCA forms are not "public disclosure documents required by law to be, and that have been, filed with the SEC." *Rothman,* 220 F.3d at 88.

Plaintiffs cite no authority that supports their distinction between "utility regulatory postings" and "securities filings." *Cf. Time Warner,* 937 F.2d at 774 (distinguishing SEC filings from "other forms of disclosure such as press releases or announcements at shareholder meetings"). Nor does such a distinction make sense in light of the purposes of PUHCA itself, which is not simply a "utility regulatory" statute but a means of protecting investors by requiring public utility holding companies to disclose "the information necessary

to appraise the financial position or earning power of the issuers." 15 U.S.C. § 79a(b)(1); *see SEC v. Associated Gas & Elec. Co.*, 24 F.Supp. 899, 902 (S.D.N.Y.) (stating that the "very first abuse" the statute says it is designed to prevent is the inability of investors to obtain such information), *aff'd*, 99 F.2d 795 (2d Cir.1938); *see also Campaign for a Prosperous Georgia v. SEC*, 149 F.3d 1282, 1283 (11th Cir.1998) ("Congress enacted the Public Utility Holding Company Act ... to protect the interests of *investors* and ratepayers.") (emphasis added). To this end, SEC regulations require that "all information contained in any notification, statement, application, declaration, report, or other document filed with the [SEC] shall be available to the public." 17 C.F.R. § 250.104(a). Indeed, the disputed materials in this case are on EDGAR[4]—the database of corporate filings available on the SEC's website—in the same location as, and interspersed with, the Company's 10–K, 10–Q, and 8–K forms. *See* Def. Aff., Ex. 15; Def. Mem. at 8–9.

All but one of the cases plaintiffs cite for the proposition that PUHCA documents are not "public disclosure documents" are distinguishable because they did not involve SEC filings, "regulatory" or otherwise. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir.1999) (report available only at law firm during business hours); *Spielman v. Gen. Host Corp.*, 538 F.2d 39, 41 (2d Cir.1976) (knowledge of company's staggered board and cumulative voting provisions); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 853–54 & n. 19 (2d Cir.1968) (information dictated to a reporter but not yet transmitted on a newswire); *In re Western Union Sec. Litig.*, 120 F.R.D. 629, 638 (D.N.J.1988) (information

disseminated through national media); *duPont Glore Forgan, Inc. v. Arnold Bernhard & Co.*, No. 73 Civ. 3071(HFW), 1978 WL 1062, *6, 1978 U.S. Dist. LEXIS 20385, at *15 (S.D.N.Y. Mar. 6, 1978) (report on widely disseminated radio wire service); *In re Faberge, Inc.*, 45 S.E.C. 249, SEC Release No. 10174, Release No. 34–10174, 1973 WL 149283, at *6 (May 25, 1973) (information provided by limited subscription wire service).

The only case plaintiffs cite that did consider the public nature *vel non* of SEC filings is also distinguishable. In *Fisher v. Plessey Co.*, 559 F.Supp. 442 (S.D.N.Y. 1983), the court denied summary judgment to the defendant, who argued that it had no duty to disclose information that was widely reported in the United Kingdom; the court found an issue of fact as to whether American investors could be charged with this information. *Id.* at 446–48. Plaintiffs here cite to a footnote in which the court stated that the plaintiff could also not necessarily be charged with financial information on file with the SEC but never mailed to investors. *Id.* at 447 n. 10.

In this court's view, this observation provides little guidance in the instant context. Not only does the footnote appear as an afterthought to a decision made on primarily other grounds, but, more importantly, the public availability of SEC financial reports has changed dramatically since 1983, the date of the *Plessey* opinion. Whether or not it was ever true that filing hard copies of documents with the SEC did not, *ipso facto*, constitute "public disclosure," in today's world it is unrealistic to argue that documents available on the SEC website are not readily accessible to the investing public. As the SEC

---

**4.** EDGAR, which is discussed below, stands for Electronic Data Gathering, Analysis, and Retrieval.

has stated, "The EDGAR system's broad and rapid dissemination benefits the public by allowing investors and others to obtain information rapidly in electronic format."[5] *See* SEC Release No. 7855 et al., 2000 WL 433278, at \*\*2–3 (Apr. 10, 2000) (SEC Final Rule). An express purpose of the EDGAR system—which since 1996 has required, absent an exemption, that companies post all SEC filings, including PUHCA filings, on the SEC website—is to ensure that investors have easy access to companies' public filings. *See id.; see also* SEC, "Important Information about EDGAR," available at www.sec.gov/edgar/aboutedgar.htm ("Its primary purpose is to increase the efficiency and fairness of the securities market for the benefit of investors, corporations, and the economy by accelerating the receipt, acceptance, dissemination, and analysis of time-sensitive corporate infor-

mation filed with the agency."). Accordingly, courts have recognized the SEC website as a "recognized channel of distribution," and have charged investors with knowledge of documents posted there. *See Lone Star Steakhouse & Saloon, Inc. v. Adams,* 148 F.Supp.2d 1141, 1144 (D.Kan.2001) ("[T]he court deems any SEC filings distributed because all filings are readily available to the public both through the Internet and other media."); *Bibeault v. Advanced Health Corp.,* No. 97 Civ. 6026(RJW), 1999 WL 301691, at \*5 (S.D.N.Y. May 12, 1999) ( ["Plaintiff's] professed lack of access to the EDGAR system and ignorance of the document's availability on the SEC internet website do not exempt him from the expectation that the average investor of ordinary intelligence can acquire materials that are a matter of public record.").[6]

5. In the release, the SEC more fully describes the public-information function of the system as follows:

> In 1984, we initiated the EDGAR system to automate the receipt, processing, and dissemination of documents required to be filed with us under the Securities Act, the Exchange Act, the Public Utility Act, the Trust Indenture Act, and the Investment Company Act. Since 1996, we have required all domestic public companies to make their filings electronically through the EDGAR system, absent an exemption. EDGAR filings are disseminated electronically and displayed on our web site at http://www.sec.gov. The EDGAR system's broad and rapid dissemination benefits the public by allowing investors and others to obtain information rapidly in electronic format. Electronic format is easy to search and lends itself readily to financial analysis, using spreadsheets and other methods. Recent technological advances, most notably the rapidly expanding use of the Internet, have led to unprecedented changes in the means available to corporations, government agencies, and the investing public to obtain and disseminate information. Today many companies, regardless of size, make information available to the public through

> Internet web sites. On those sites and through links from one web site to others, individuals may obtain a vast amount of information in a matter of seconds.
>
> SEC Release No. 7855, 2000 WL 433278, at \*\*2–3.

6. For the same reason—that is, the dramatic increase in recent years in public access to information via the Internet—the court finds distinguishable *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190 (2d Cir.1993), which plaintiffs do not discuss. Although the Second Circuit in that case found that the defendant's 10–K report was not part of the mix of information reasonably available to shareholders, the court based this decision in part on the fact that the report had simply been filed with the SEC and not distributed to shareholders. *Id.* at 1199. Although more recent than the 1983 *Plessey* decision, *United Paperworkers* nonetheless predates that the explosion in Internet availability and use generally, and the institution of mandatory filing on EDGAR in particular. Moreover, if read too broadly, the holding that shareholders cannot be charged with knowledge of information in a company's SEC filings would undermine the very rationale for allowing consideration of such filings on a motion to dismiss—name-

For the foregoing reasons, the court concludes that the PUHCA documents are "public disclosure" documents filed with the SEC and, as such, are appropriate for consideration in connection with the instant motion. A contrary conclusion would frustrate the purpose of the rule permitting consideration of SEC filings on a motion under Rule 12(b)(6), which is to ensure that "doomed" securities fraud complaints do not avoid dismissal by selective and misleading quotation from public documents. *See Time Warner,* 937 F.2d at 774; *see also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991). Although the documents in this case are not, as is often the case, the very documents alleged to contain misleading information, the court is not constrained to consider only such documents. *See Time Warner,* 937 F.2d at 774 (court may "of course" consider "related documents that bear on the accuracy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements"); *Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1405 (S.D.N.Y.1996) (considering registration statements and prospectuses not referenced in the complaint because such SEC

ly, that such filings are matters of public record. *See Time Warner,* 937 F.2d at 774. It would make little sense never to consider 10–K forms and other SEC filings to be public information, given that the fundamental purpose of such filings is to protect investors by requiring publicly traded companies to disclose information about their operations and finances.

Further, the *United Paperworkers* decision may be distinguished on the ground that the plaintiffs in that case alleged that they had been misled by affirmative representations in a proxy statement that were contradicted by information in the 10–K forms. The court found that the effect of defendants' rosy characterization of its environmental record in a proxy statement, issued in opposition to a shareholder proposal to adopt new environmental standards, was not counteracted by disclosures of the company's poor environmental record in its Form 10–K. *Id.* at 1199–1200. Unlike the instant case, then, *United Paperworkers* did not involve allegations of mere nondisclosure of information, but of affirmatively misleading statements on the very subject about which the defendant claimed to have made public disclosures in other filings. This distinction is further suggested by the different causes of action in the two cases: in *United Paperworkers,* plaintiff alleged that defendant made misleading statements in a proxy statement to shareholders; here, plaintiffs allege that defendants misled the investing public at large. It stands to reason that the universe of information a shareholder would consider when voting in a proxy contest concerning a specific issue is smaller than, or at least different from, the corresponding universe an investor would consider when deciding whether to purchase or a retain a publicly traded stock in the first instance.

The court also finds distinguishable *Kronfeld v. Trans World Airlines,* 832 F.2d 726, 736 (2d Cir.1987), which plaintiffs cite, and in which the court found a question of fact as to whether a misleading omission in a proxy statement was cured by information made public in connection with an earlier, highly publicized proxy solicitation. In the particular circumstances of that case, the court found that shareholders would have had strong reason to believe that the information relating to the earlier solicitation was no longer current. *Id.* No such circumstances exist here. Moreover, it is unclear from the decision whether the defendant had argued that the extensive media coverage of the earlier solicitation rendered the allegedly nondisclosed information "public," or whether defendant relied on information in the proxy solicitation itself. It is thus somewhat misleading of plaintiffs to summarize the holding in *Kronfeld* as pertaining to the adequacy of "non-contemporaneous disclosures made in separate securities filings." Pl. Mem. at 35. In any event, the case simply does not address the issue here, which is whether, as a general matter, a company "publicly discloses" information by filing it with the SEC. As discussed below, it is an analytically distinct issue whether, notwithstanding such disclosures, KeySpan's public statements were misleading.

filings "are required public disclosure and therefore properly considered on a motion to dismiss"). Accordingly, the court will consider the PUHCA filings in deciding defendants' motion.[7] Consideration of such documents, of course, is not tantamount to a finding that the documents negate all or any of the elements of plaintiffs' claims. It is to the sufficiency of these pleadings, reviewed alongside the PUHCA filings and defendants' other public disclosures, that the court now turns.

## II. Application

### A. Plaintiffs' Allegations Regarding the Effects of PUHCA

█ Plaintiffs allege that throughout the class period, every public statement made by the Company was false and misleading because defendants failed to make full disclosure regarding its impending regulation under PUHCA. Beginning with the November 4, 1999, announcement of the merger with Eastern, the Company allegedly failed to reveal that this merger would require the divestment of Midland, and of a substantial portion of Roy Kay, at a material loss to the Company. Thus, all statements regarding the benefits of the merger itself, such as the projected $24–29 million dollar annual savings, are alleged to be fraudulent. The Company's concealment of the negative effects of the merger is further demonstrated, plaintiffs allege, by its failure to properly account for the likelihood, or at least the possibility, of future losses resulting from the Midland divestiture.

Defendants contend that KeySpan repeatedly disclosed not only that it would be subject to PUHCA as a result of the Eastern merger but also that it would be required to divest Midland. Defendants also contend that KeySpan adequately disclosed the possible effects of PUHCA on the Roy Kay acquisition. Defendants argue that these disclosures are fatal to plaintiffs' allegations that the defendants deliberately withheld material information from investors. The court agrees.

Although plaintiffs cite May 2000 as the first instance in which the Company mentioned that the Eastern merger would make KeySpan a registered holding company under PUHCA, the Company in fact revealed this information in March 2000. In its 1999 Form 10–K, filed March 10, 2000, KeySpan disclosed that its acquisition of Eastern would subject the Company to PUHCA. In the introductory section of the filing, the Company stated,

> With the consummation of the Eastern Transaction, the Company will become a registered holding company under the Public Utility Holding Company Act of 1935, as amended ("PUHCA"). As such, the corporate and financial activities of the Company and its subsidiaries, including the ability of each to pay dividends, will be subject to the regulation of the SEC.

Def. Ex. 2 at 2. The 10–K form repeats this information, including the possible effect on the Company's ability to pay dividends, in a section entitled "Regulation and Rate Matters." *Id.* at 23. In two other places as well, the form refers to the Company's future status as a registered holding company under PUHCA. *Id.* at 40, 57–58. Additionally, the filing states several times that the merger is conditioned upon the approval of several regulatory bodies, including the SEC. *Id.* at 2,

---

7. By contrast, the court will give no consideration to the affidavits plaintiffs have submitted from a certified public accountant and a chartered financial analyst in response to defendants' motion. The impropriety of plaintiffs' submission of these materials on a motion to dismiss requires no discussion.

40, 107. In this regard, the form specifically refers to the Company's March 6, 2000 application to the SEC to become a registered holding company under PUHCA. *Id.* at 23. In the March 6 application, a Form U–1 posted on EDGAR, the Company expressly acknowledges both the likelihood that divesting Midland would be required under PUHCA and the possibility that portions of Roy Kay's operations might also be restricted. This application is discussed more fully below.

Where allegedly undisclosed material information is in fact readily accessible in the public domain, the Second Circuit has found that a defendant may not be held liable for failing to disclose this information. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978) ("Although the underlying philosophy of the federal securities regulations is that of full disclosure . . ., there is no duty to disclose information to one who reasonably should be already aware of it.") (citations and internal quotation marks omitted); *see also Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir.1979) ("In determining whether [information in proxy statements] constituted full and adequate disclosure, the district court properly took into account information already in the public domain and facts known or reasonably available to the shareholders."); *Sailors v. Northern States Power Co.*, 4 F.3d 610, 614 (8th Cir.1993) (upholding summary judgment against plaintiff where "[m]uch of what the plaintiff argues was hidden from public view is actually part of the regulatory process and upon reasonable inquiry was available to the public"). Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed. *See, e.g., Debora v. WPP Group, P.L.C.*, No. 91 Civ. 1775(KTD), 1994 WL 177291, at *5 (S.D.N.Y. May 5, 1994) ("A complaint fails to state a § 10(b)

claim when the alleged omission has actually been disclosed.") (citing *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 116–17 (2d Cir.1982)); *Sable v. Southmark/Envicon Capital Corp.*, 819 F.Supp. 324, 333 (S.D.N.Y.1993) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.") (citation and quotation marks omitted); *White v. Melton*, 757 F.Supp. 267, 272 (S.D.N.Y.1991) ("The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly omitted or misrepresented information was in fact appropriately disclosed.").

Moreover, in the specific context of public utilities, courts have found no duty to disclose publicly available information relating to the possible effects of the regulatory process on the utilities' business. In *Sailors*, for example, the Eighth Circuit held that defendant, a public power company, could not be held liable for failing to inform investors of the various obstacles to its receiving regulatory approval for a rate increase. *Id.* at 612–13. The court found that having informed investors of the application for the increase, the utility was under no obligation to "engage in a day-by-day, play-by-play announcement of this proceeding." *Id.* at 612. The court stated, "We agree with the Seventh Circuit's conclusion that once a utility has informed investors that it is involved in a regulatory proceeding, it has no affirmative duty to provide investors with a further summary of the regulatory process." *Id.* (citing *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515–18 (7th Cir.1989)). Stating that the securities laws require disclosure only of "information *that is not otherwise* in the public domain," *id.* at 613 (citation omitted; emphasis in original), the Eighth

Circuit affirmed the judgment against the plaintiff because the allegedly undisclosed information about the rate application was contained in "public filings ... equally available to all." *Id.* Other circuits have similarly refused to find liability premised on a utility's failure to disclose information about the regulatory process that was in fact a matter of public record. *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1142 (9th Cir.1996) (where utility had alerted public to regulatory proceedings concerning application for rate increase, it had "no duty to inform the public of any facts or circumstances in addition to those set forth in the application"); *Wielgos*, 892 F.2d at 515 (utility company had no duty to inform public of risk that government might reject its application for a license to operate certain nuclear power plants).[8]

In the view of the court, the disclosures in defendant's March 10 Form 10–K alone defeat nearly all of plaintiffs' claims relating to the effects of the Company's status under PUHCA.[9] The form contains repeated statements that the Company would be subject to PUHCA, along with express warnings that the Company's ability to pay dividends could thereby be affected. The filing also contains several warnings that the merger was subject to the approval of several government entities, including the SEC. Under the reasoning of the utility cases discussed above, this information adequately notified investors that the merger with Eastern would involve the Company in a new set of regulations, and that these regulations would have a variety of effects on KeySpan's operations and finances. The Company was not required to provide investors with a summary of PUHCA, the purposes and specific requirements of which are, of course, matters of public record. *See Wielgos*, 892 F.2d at 517 ("It is pointless and costly to compel firms to reprint information already in the public domain. Issuers needn't print the Code of Federal Regulations...."). Put another way, the Company cannot be held liable for withholding information it had no duty to disclose. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir.1992) (citation omitted) ("[T]here is no liability under Rule 10b–5 unless there is a duty to disclose....").

■ Even assuming, *arguendo*, the Company had an obligation to disclose more specific information regarding the possible effects of PUHCA on its business, this duty was wholly discharged by the March 6, 2000 Form U–1 filed with the SEC. In the form, which is an application for SEC approval of the merger with Eastern, the Company expressly recognizes

---

**8.** *In re Sprint Corp. Sec. Litig.*, 232 F.Supp.2d 1193 (D.Kan.2002), cited by plaintiffs, is not inconsistent with this general principle. In that case, the court found that Sprint had a duty to disclose to investors that its proposed merger with WorldCom was unlikely to receive regulatory approval. The court based the duty to disclose on two factors, not present here: (1) Sprint possessed specific and substantial negative information about the likelihood of regulatory approval, and (2) Sprint had made affirmative statements predicting the likelihood of such approval. *See id.* at 1219. Here, defendants made no assurances regarding the particular negative outcome that came to pass—the $30 million loss from the sale of Midland—nor have plaintiffs pointed to any undisclosed information defendants possessed ahead of time indicating that this outcome was likely. In the case of Roy Kay, no PUHCA-related negative result even occurred.

**9.** Plaintiffs' claims arising from statements made before March 10, 2000, are discussed later in this section.

that PUHCA would require the divestiture of Midland:

> Eastern's predominant non-utility subsidiary, Midland ... is engaged, through wholly owned subsidiaries, in activities which KeySpan recognizes do not satisfy the standard for retention by a registered gas utility holding company under [PUHCA]. KeySpan requests that any order that the Commission issues which approves the Transaction but requires KeySpan to divest of Midland ... permits KeySpan to take the appropriate actions to effect the sale of all its interests in Midland, its subsidiaries, and assets, within three years after the Transaction is consummated.

Def. Ex. 14 at 41. In addition to the foregoing acknowledgment and request, the U–1 explicitly discusses the possible effects of PUHCA on the operations of Roy Kay. Under the heading "Retention of Non–Utility Businesses," *id.* at 27, the Company enumerates various non-utility business interests and applies to the SEC for permission to retain those businesses after the merger. In this section, which mentions Roy Kay by name and describes the non-utility aspects of its operations, *id.* at 34, the Company discusses why it believes PUHCA and applicable SEC rulings permit it to retain the non-utility businesses in question.

Thus, contrary to plaintiffs' assertions, the Company publicly acknowledged the very information that plaintiffs contend it concealed: the likelihood that the Eastern merger would result in the divestiture of Midland, and the existence of non-utility aspects of Roy Kay for which the Company would require SEC approval to retain. As discussed, the March 6 Form U–1 was a matter of public record, and was available on EDGAR alongside the Company's other public disclosure documents. Moreover, the March 10 Form 10–K, although

not referring to the U–1 form by name, specifically referred to the Company's March 6 application with the SEC to become a registered holding company under PUHCA. Def. Ex. 2 at 23. Even investors unaware of the "utility regulatory postings" required by PUHCA were thus made aware of one such filing, which contained detailed information regarding the effects of PUHCA regulation on the Company.

Because plaintiffs do not allege that defendants made any affirmative misstatements regarding the impact of PUHCA on its ability to retain Midland or Roy Kay, but merely that defendants omitted information about PUHCA from its public statements, the court need focus only on whether this information was ever in fact made public. In light of the court's finding that the Company's March 6 and March 10, 2000 SEC filings satisfied the Company's disclosure obligations related to PUHCA, it would be redundant to consider the Company's subsequent disclosures on the issue. The court simply notes that the Company's SEC filings in early March 2000 are but the earliest disclosures of the PUHCA-related information during the class period. As defendants point out, the Company's public filings throughout the class period contain numerous similar—and similarly adequate—public disclosures of both the general fact that KeySpan would be subject to PUHCA and of the specific ramifications of PUHCA for Midland and Roy Kay.

Although the foregoing analysis requires dismissal of all PUHCA-related claims arising after early March 2000, when the allegedly undisclosed PUHCA-related information was in fact disclosed, the complaint alleges two sets of fraudulent statements earlier in the class period. Specifically, plaintiffs allege that the November 4, 1999 announcement of the

merger with Eastern and the February 4, 2000 announcement of the acquisition of Roy Kay failed to warn investors that the benefits of these transactions would be limited, if not offset entirely, by the Company's new status under PUHCA. Plaintiffs further allege that the November release represented, without a good faith basis for doing so, that annual net savings from the merger would be $24–$29 million, phased in over a two-year period.

Defendants do not directly address these two sets of statements in their discussion of the inadequacy of plaintiffs' PUHCA allegations. Defendants argue, however, that disclosures in the proposed merger agreement between KeySpan and Eastern, which was attached to the Company's November 4, 1999 Form 8–K, alerted investors to the applicability of PUHCA and the possibility that the SEC would require divestiture of Midland. The court doubts that the agreement's single, oblique reference to PUHCA and Midland constitutes public disclosure of these aspects of the merger. The clause cited by defendants merely states that if KeySpan were required to register under PUHCA or to divest Midland, such events would not constitute grounds for KeySpan or Eastern to avoid the merger.

Nevertheless, to the extent plaintiffs allege that defendants failed to disclose that PUHCA would require divestment of Midland and limitations on Roy Kay "at a substantial and material cost to the Company," Compl. ¶ 85, such allegations amount to mere "fraud by hindsight." *Novak*, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. . . . Thus, allegations that defendants should

have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."). As to the November 4, 1999 announcement, nothing in the complaint indicates that any defendant knew at that time that the Midland divestiture, if and when it ultimately happened, would result in a loss.[10] Although the lack of such knowledge goes primarily to the inadequacy of plaintiffs' scienter allegations, discussed below, the failure of the complaint to point to any information suggesting defendants knew ahead of time that the Midland sale would result in a loss also defeats the contention that defendants' positive statements regarding the Eastern merger were false when made. The allegations that defendants had a duty to disclose that the Roy Kay acquisition would result in a loss because of the limiting effects of PUHCA also fail for this reason, and for the more fundamental reason that plaintiffs have not alleged that the losses ultimately realized because of the Roy Kay acquisition actually had anything to do with PUHCA. In this regard, plaintiffs have not even alleged fraud by hindsight.

In conclusion, the court finds that all of the complaint's allegations regarding the effects of PUHCA on the Roy Kay and the Eastern acquisitions fail as a matter of law. Additionally, the court finds that these allegations fail to adequately plead scienter, a fact that independently warrants their dismissal. Although the court's discussion of scienter in the following section focuses on the allegations regarding the operational and financial difficulties at Roy Kay, the reasoning and the holding apply equally to the allegations related to PUHCA.

---

**10.** There is no reason alleged why the forced sale of Midland would foreseeably and necessarily entail a loss, since presumably the Company would obtain the market value for the asset.

## B. Plaintiffs' Allegations of Scienter

 To be successful, a complaint under Rule 10b–5 must allege facts giving rise to a strong inference of scienter. As mentioned, the Second Circuit recognizes two ways of pleading scienter. A plaintiff must plead facts that either establish that the defendants had "motive and opportunity" to commit fraud, or that constitute "strong circumstantial evidence of conscious behavior or recklessness." *Kalnit*, 264 F.3d at 138. Plaintiffs here contend that the complaint sufficiently alleges scienter under both theories. The court therefore must examine whether the complaint satisfies the standards developed for either.

### 1. Motive and Opportunity

The parties do not dispute whether the individual defendants, by virtue of their senior positions at the Company, had the opportunity to commit fraud. The question, therefore, is whether plaintiffs have sufficiently pleaded motive.

Plaintiffs' primary contention with respect to motive is that during the class period, defendants sold a large amount—$58 million in the aggregate—of their personal shares in KeySpan. In addition to the high volume, plaintiffs contend that the timing of the sales was suspicious. Plaintiffs point to the fact that the most of the sales took place in two concentrated periods, during December 2000 and in May 2001. The December 2000 sales are alleged to arouse suspicion because these took place one month after the acquisition of Eastern, with all of the negative, PUHCA-related effects this would entail. Further, plaintiffs contend that December 2000 is the time when Roy Kay began to show signs that it too would be a serious drain on KeySpan's financial health. As for the May 2001 sales, plaintiffs contend that an inference of fraudulent intent arises from the fact that these took place "just prior" to the Company's July 17, 2001 announcement of the $30 million charge to earnings because of problems at Roy Kay. Compl. ¶ 153. Plaintiffs also point out that all of the defendants except one had not sold any of their shares in the year prior to December 2000. Finally, the complaint alleges that an additional inference of motive arises from defendants' desire to gain performance-based salary bonuses and stock options.

 Under Second Circuit precedent, "[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). A plaintiff cannot allege motive by pointing to incentives possessed by nearly all corporate insiders, such as "the desire to maintain a high corporate credit rating ... or otherwise to sustain the appearance of corporate profitability or of the success of an investment ..., and ... the desire to maintain a high stock price in order to increase executive compensation ... or prolong the benefits of holding corporate office." *Id.* (citations and internal quotation marks omitted). On the other hand, a plaintiff sufficiently pleads motive by alleging that defendants "misrepresented corporate performance to inflate stock prices while they sold their own shares." *Kalnit*, 264 F.3d at 138. However, " '[t]he mere fact that insider stock sales occurred does not suffice to establish scienter.' " *Ressler v. Liz Claiborne, Inc.*, 75 F.Supp.2d 43, 58 (E.D.N.Y.1999) (quoting *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1224 (1st Cir.1996)). For insider sales to raise an inference of improper motive, they must be "suspicious" or "unusual." *See id* (collecting cases); *Acito*, 47 F.3d at 54 ("Insider sales of stock may be evidence of scien-

ter if the trades are unusual or suspicious in timing or amount."). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp.*, 252 F.3d at 74–75.

One aspect of plaintiffs' attempt to plead motive is easily disposed of. Plaintiffs' allegation that defendants sought rewards based on the Company's performance constitutes precisely the sort of commonplace and hence unsuspicious motive that courts have routinely found insufficient to establish scienter.[11] *See Novak*, 216 F.3d at 307 (collecting cases).

The allegations of insider sales, though somewhat more troubling, also do not raise the requisite strong inference of fraudulent intent. Questions might arise because so many insiders traded at roughly the same time on two separate occasions and realized a collective total of $58 million in profits. *See In re Scholastic Corp.*, 252 F.3d at 74–75 (amount of sales and number of insiders selling are relevant factors); *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ($78 million profit from sales during the class period is "massive by any measure"), *cited in Rothman*, 220 F.3d at 94. However, several circumstances surrounding the sales militate against an inference of fraud.

First, plaintiffs do not adequately plead that defendants, individually or collectively, sold a large percentage of their total shares; large dollar amounts, standing alone, typically do not suffice to establish motive. *See, e.g., Acito*, 47 F.3d at 54 (large volume of sales by defendant were not suspicious because the shares that he sold represented only 11% of his total holdings); *Ressler*, 75 F.Supp.2d at 59 ("[L]arge proceeds alone are not suspicious per se, . . . and other relevant facts may undermine any inference of fraud arising from them.") (internal citation omitted) *Duncan v. Pencer*, No. 94 Civ. 0321(LAP), 1996 WL 19043, at *12 (S.D.N.Y. Jan.16, 1996) ("[B]are allegations of their trading [sales by nine defendants totaling $29 million] fail to indicate, for example, how many shares the Individual Defendants retained after the sales."). Beyond the $58 million tally, the complaint merely alleges that the individual defendants "liquidated all or substantially all" of their holdings during the class period. Compl. ¶ 150. Defendants counter that the publicly filed records of the individual defendants' trading activity, which defendants have attached to their motion, undermine this allegation.[12] For instance, defendants point out, and plaintiffs do not dispute, that the individual defendants sold

---

11. Plaintiffs concede that such generalized motives cannot by themselves establish scienter, but argue that the court should nevertheless consider these compensation incentives "in the total mix of factors that are alleged to constitute motive and hence scienter." Pl. Mem. at 64. This argument is puzzling. If a motive is so generic as to be unsuspicious, and the plaintiff does not allege any particular facts as to why that motive *in the individual case* is suspicious, then it adds nothing to the "total mix." *See In re Carter–Wallace, Inc. Sec. Litig.*, No 94 Civ. 5704(KTD), 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999)

("Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one or more specific motives."), *aff'd*, 220 F.3d 36 (2d Cir.2000).

12. Plaintiffs have not objected to the court's consideration of these records, which in any event clearly fall into the category of public disclosure documents that are required to be, and were, filed with the SEC. *See Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir.2001) (noting that "record of insider sales is a matter of public record").

less than 20% of their available holdings in May 2001. Courts have found no inference of scienter in cases involving even greater percentages of sales. *See, e.g., In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1092 (9th Cir.2002) (individual defendants' sales of 38% of their aggregate holdings); *Ronconi,* 253 F.3d at 435–36 (seven of eleven insider defendants sold 69% of shares and options, and eighth defendant sold 98% of total shares); *but cf. Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 82, 85 (2d Cir.1999) (CEO's sales of 40% of holdings supported inference of fraud). Defendants further contend, and the court agrees, that the $58 million figure is misleading, given that it comprises two sets of sales six months apart (as well as a small amount of sales during the intervening period). *Cf. In re Vantive,* 283 F.3d at 1092 ("It is obvious why [plaintiffs have chosen an 'unusually long class period of sixty-three weeks']. It is not because the allegations found elsewhere in the complaint support an inference of fraud throughout the class period, but because lengthening the class period has allowed the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period.").

Moreover, as defendants note, the individual defendants actually held more shares at the close of the class period than at the outset. The net acquisition of shares cuts against the notion that defendants sought to unload their holdings of KeySpan stock before their likely diminution in value following the disclosure of negative insider information. *See Ressler,* 75 F.Supp.2d at 60 ("Inferences of scienter can be undermined when an insider['s] sales of stock are offset by even larger stock acquisitions during the relevant time period."); *see also Searls v. Glasser,* 64 F.3d 1061, 1068 (7th Cir.1995) (net acquisi-

tion of shares during class period was "a position unlikely to be taken by an insider who has unpublished knowledge of the company's slowdown"); *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 899 (W.D.N.C.2001) (increase of officer's net holdings during class period was "wholly inconsistent with [plaintiff's] contention that he knew undisclosed negative information about the company").

Plaintiffs attempt to minimize the significance of the "nominally" greater holdings of defendants at the end of the class period by noting that these holdings comprise a substantial number of shares purchased through the exercise of options; these purchases allegedly involved no risk to defendants because the strike price of the options was "considerably lower" than the market price. Pl. Mem. at 63. This argument is unpersuasive, given that defendants' retention of the shares so acquired remains inconsistent with the allegation that defendants harbored information that the Company's financial health was in grave jeopardy. Stated another way, the price at which defendants acquired their shares seems largely immaterial to the decision on their part whether to hold or to sell the stock at any particular time. Other courts have similarly found it appropriate to take into account a defendant's shares purchased through options. *See Ressler,* 75 F.Supp.2d at 58–59; *In re First Union,* 128 F.Supp.2d at 898; *see also In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 986–87 (9th Cir.1999) (considering actual stock shares plus exercisable stock options); *Acito,* 47 F.3d at 54 (same).

Additional factors weigh against an inference of scienter. First, Defendant Catell, the CEO and chairman of the board, did not sell any shares in May 2001. As chairman and CEO of the Company, and as the individual who actually made most

of the alleged misstatements during the class period, defendant Catell, if anyone, was surely well-positioned to reap profits from insider knowledge. His failure to do so in May 2001—which, of the two "sell-off" periods alleged by plaintiffs, is the only one whose timing is even plausibly suspicious [13]—is thus significant. Moreover, eight other KeySpan officers who were required to file public records of their stock holdings—and who are not named as defendants—did not sell any stock in May 2001. As one court has explained, this fact is both relevant and appropriate to consider under the circumstances:

> Moreover, all insiders (officers and directors) retained over 90% of their stock holdings.... This percentage is more meaningful than the percentage of stock sold by defendants where, as here, the complaint is devoid of any specific allegations as to any defendant. To hold otherwise would allow a securities fraud plaintiff to "cherry-pick" defendants based solely on the fact of whether, and how much, an insider sold.

*In re FVC.COM Sec. Litig.*, 136 F.Supp.2d 1031, 1039 (N.D.Cal.2000) (internal citation omitted), *aff'd*, 32 Fed.Appx. 338 (9th Cir. 2002); *see also In re First Union*, 128 F.Supp.2d at 899 ("[M]any key First Union executives not named as defendants—including the Company's Chief Financial Officer—did not sell a single share. This fact alone is fatal to Plaintiffs' effort to establish scienter through stock sales."); *see also Acito*, 47 F.3d at 54 ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (citation and internal quotation marks omitted). Here, where the complaint contains no specific allegations as to any of the defendants except for Catell, Luterman, and Feraudo—and makes only minimal allegations regarding these three—it is appropriate to consider the trading activity of other nondefendant high-level executives, who, from all that appears from the complaint, were no less likely to be privy to insider information than the named defendants.

Finally, nothing about the timing of either cluster of sales raises a strong inference of fraud. Plaintiffs contend that the December 2000 sales came suspiciously close on the heels of the announcement of the consummation of the Eastern merger, in November 2000. However, as discussed in Section II, *supra*, the Company had long since disclosed the PUHCA-related ramifications of this transaction. Coming well after numerous public disclosures concerning the effect of PUHCA on the Company's finances generally and on its ability to retain Midland in particular, these "insider trades" cannot logically be attributed to defendants' desire to take advantage of any market deception about these issues. Moreover, even if the court were to accept plaintiffs' allegations that defendants kept the public in the dark about PUHCA and Midland until January 2002, defendants' sales of stock more than a year before, in December 2000, hardly appear timed to allow defendants to realize gains prior to an imminent decrease in the stock's value. *See Ressler*, 75 F.Supp.2d at 60 (timing of stock sales six months before release of negative information "does not suggest that defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price"). Rather, the long lapse of time between the sales and the alleged ultimate disclosures suggests that one or more other factors, unre-

---

**13.** This point is addressed immediately below.

lated to the alleged fraud, led to defendants' decision to make the sales.

Likewise, the lapse of time between the allegedly fraudulent November 9, 2000 announcement of the Eastern acquisition and the December sales—a period of at least four to six weeks—tends to negate any inference that defendants "sought to reap the immediate benefit a falsely positive statement had on the market." *Ressler*, 75 F.Supp.2d at 60 (finding no inference of suspicion where sales took place "well over two weeks" after the complained-of comments). The December 2000 sales post-date all of the earlier alleged false comments by an even longer amount of time. Conversely, the sales pre-date all of the alleged false statements in 2001, and thus provide no suggestion of improper motives regarding those statements. *See Rothman*, 220 F.3d at 95; *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989) (sales of stock before false statements not probative of bad faith because "[a]s sophisticated investors, defendants must have known that pre-class period sales would deprive them of much of the value of their 'false' optimism").

Plaintiffs further contend that an inference of motive arises from the December 2000 sales because it was allegedly at this moment that defendants were just becoming aware of the severity of problems at Roy Kay. In support of this contention, plaintiffs point to Roy Kay's contract problems with New York City in February and March 2000, and with Stony Brook and Old Westbury in October 2000; additionally, plaintiffs allege that in December 2000 Roy Kay received a notification that it was $200,000 in arrears in its contractual obligations, as well as a letter from the IRS stating that it owed $100,000 in back taxes. Leaving aside the fact, discussed below, that the complaint alleges no facts suggesting that any of the individual defendants had contemporaneous knowledge of these developments, the court finds these disparate events, scattered over a ten-month period, raise only the weakest inference of suspicion, if any, regarding the timing of defendants' December sales. Moreover, as discussed with regard to the November 9 Eastern announcement, nothing explains why these sales took place after a year of alleged fraudulently positive statements omitting information about Roy Kay, and seven months before any negative public disclosures about Roy Kay. Significantly, plaintiffs do not attempt to link defendants' supposed insider knowledge in December 2000 to any particular fraudulent statement.

Similarly, plaintiffs do not allege enough of a connection between the May 2001 insider sales and any public statement to give rise to a strong inference of fraud. Plaintiffs do not allege that the May 2001 sales followed closely on the heels of any falsely positive statement. Although the complaint does allege that the May 2001 sales occurred just before the Company's July 17, 2001 announcement of problems at Roy Kay, the court does not find the two-month gap to be strongly suspicious in light of the other factors weighing against an inference of fraud. *See Nursing Home Pension Fund, Ltd., v. Oracle Corp.*, No. C. 01–0988(MJJ), 2002 WL 31971731, at *12 (N.D.Cal. Sept. 11, 2002) (no inference of fraud where sales took place two months prior to negative disclosures); *Head v. NetManage, Inc.*, No. C 97–4385(CRB), 1998 WL 917794, at *4 (N.D.Cal. Dec 30, 1998) (same). The two cases cited by plaintiffs for the proposition that a two-month lapse between sales and negative disclosures supports an inference of motive are distinguishable; each involved additional suspicious circumstances not present here. *See In re Oxford Health Plans*, 187 F.R.D. at 139–40 (finding timing of trades was " 'suspicious' " enough,

"along with the other evidence, to support a strong inference of scienter"; evidence included directors' sales of 17% to 67%, and from 11% to 100%, of their shares) (emphasis added); *Simon v. American Power Conversion Corp.*, 945 F.Supp. 416, 421–23, 435 (D.R.I.1996) (sales were one to two months before negative disclosure, and were in close proximity to alleged falsely positive statements). In the absence of other surrounding circumstances rendering May 2001 a particularly propitious moment for defendants to profit from insider trading, the court cannot draw a strong inference of scienter from these sales. Simply stated, defendants' sales do not appear "calculated to maximize personal benefit from insider information." *Ressler*, 75 F.Supp.2d at 60 (quoting *In re Apple Computer*, 886 F.2d at 1117).

### 2. Conscious Behavior or Recklessness

■ Having concluded that the complaint inadequately pleads motive, the court must next determine whether it alleges facts that "demonstrate strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 142 (citation and internal quotation marks omitted). The strength of such circumstantial evidence must be "correspondingly greater" than that which suffices to show motive. *Id.* Conduct qualifies as reckless where it is "highly unreasonable" and represents "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman*, 220 F.3d at 90 (citing *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978) (internal quotation marks omitted)); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness."). Summarizing cases where this standard was met, the Second Circuit has stated, "[S]ecurities fraud claims have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statement. Under the circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

Plaintiffs have not met this standard. Although the complaint is long on details of the mounting difficulties at Roy Kay, it is short on facts suggesting that any of defendants had contemporaneous knowledge of these difficulties. Without such facts, the complaint does nothing more than allege that because defendants ultimately disclosed negative information about Roy Kay, they must have been aware of this information earlier. Such allegations, of course, constitute the fraud by hindsight formula that courts have rejected. *See, e.g., Acito*, 47 F.3d at 53 ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."); *Shields*, 25 F.3d at 1129 ("This technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud.").

With the exception of defendant Feraudo, whose dealings with Roy Kay are discussed below, none of the defendants is alleged to have had any individual involvement with Roy Kay. Although plaintiffs allege numerous specific problems at Roy Kay, the complaint alleges no facts connecting any of the defendants to these problems. Plaintiffs fail to specify how

and when the defendants became aware of information about Roy Kay contradicting their public statements. For instance, plaintiffs attach letters to Roy Kay written during the class period that document Roy Kay's various contractual and fiscal troubles, but they do not allege specific facts suggesting that any of the defendants was aware of these letters. Plaintiffs implicitly concede the absence of facts establishing that defendants knew of this correspondence before March 2001. Pl. Mem. at 30 ("KeySpan even received direct notice of one of these disasters.") (citing to March 20, 2001 letter from bond company informing Roy Kay and KeySpan that Roy Kay had defaulted on bond, Compl. ¶ 77 & Ex. E.). Plaintiffs' mere incantation that the problems at Roy Kay were "severe and obvious" does not suffice. Pl. Mem. at 55. Without specific allegations pointing to defendants' awareness or recklessness, plaintiffs have not alleged fraud with the particularity required by Rule 9(b) and by the securities laws. *See Shields*, 25 F.3d at 1129 ("Shields's frequent conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b). We have held in the context of securities fraud claims that such allegations are 'so broad and conclusory as to be meaningless.'") (citing *Decker*, 681 F.2d at 119–20); *Elliott Assocs., L.P. v. Covance*, No. 00 Civ. 4115(SAS), 2000 WL 1752848, at *11 (S.D.N.Y. Nov.28, 2000) ("Plaintiffs do not point to any concrete contrary information that would establish the falsity of the statements in issue. Rather, plaintiffs state, in all too conclusory terms, that 'Defendants clearly knew well before June 25, 1999 that the merger was likely to fail.'")

Plaintiffs' allegations that defendants must be charged with knowledge of activities at Roy Kay by virtue of their high-level positions are equally insufficient. *See In re Health Mgmt., Inc. Sec. Litig.*, 970 F.Supp. 192, 204–05 (E.D.N.Y.1997) (allegations that defendant was board member, was privy to inside information, and "was responsible for monitoring the overall management and direction" of the company were insufficiently specific to satisfy pleading standard); *Duncan*, 1996 WL 19043, at *14 (mere allegations defendants were senior executives and had thus access to inside information insufficient; "Duncan would totally thwart the scienter requirements of Section 10(b) and Rule 9(b) if he could satisfy them by simply listing the Individual Defendants' job titles in the Complaint."); *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 283 (D.Mass.1998) (rejecting allegations of scienter that "consist[ed] solely of general inferences that defendants, by virtue of their position within the company, 'must have known' about the company's problems when they undertook allegedly fraudulent actions."). The cases cited by plaintiff in which courts charged defendants with knowledge of negative information by reason of their status involved circumstances far more suggestive of their direct access to such information. *See, e.g., Cosmas*, 886 F.2d at 12 (imputing knowledge of restrictions on Chinese market to directors touting importance of Chinese market); *In re Ancor Communications, Inc., Sec. Litig.*, 22 F.Supp.2d 999, 1004 (D.Minn.1998) (charging defendants with knowledge of fundamental problems regarding "undeniably the most significant contract in [the company's] history"); *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326 (E.D.Wash.1998) (charging defendants with knowledge that "core product [was] technologically incapable of meeting requirements that [were] central to [the company's] continued survival as a business entity"). Thus, although the court might charge senior KeySpan officials with

knowledge of a major contract dispute with the Company's largest customer, say, the problems at Roy Kay are simply not of such a magnitude as to excuse plaintiffs from the usual rule requiring specificity.

The court thus finds inadequate the scienter allegations against the individual defendants, all but three of whom are not specifically named in connection with plaintiffs' discussion of scienter. The allegations regarding Catell, Luterman, and Feraudo, the three who are named, are no more adequate than those leveled generically at everyone else. As to Catell and Luterman, plaintiffs merely repeat their conclusory assertion that because of their high positions—as chief executive officer and chief financial officer, respectively—they "undoubtedly" knew of the problems at Roy Kay and were "charged with the responsibility of being aware" of these problems. Pl. Mem. at 58. Such allegations, however, are precisely the sort of vague conclusions that courts have rejected. Additionally, plaintiffs argue that Catell and Luterman made or signed the alleged false statements, which, while true, says nothing about whether they intended to defraud investors in doing so.

With respect to defendant Feraudo, plaintiffs allege that he was "undeniably aware (or was surely reckless in not knowing)" of the problems at Roy Kay because he was instrumental in the acquisition of Roy Kay, he was the "hatchet man" when the two companies parted, and he made public statements extolling KeySpan's pos-

itive outlook. Pl. Mem. at 58. The latter allegation, as mentioned, says nothing about his state of mind in making such statements, and thus allows for no inference of fraud. Though extensive in comparison with those regarding the other defendants', the other two allegations about Feraudo's involvement with Roy Kay, considered on their own merits, also provide no reason to believe that Feraudo had ongoing knowledge of the negative information about Roy Kay the Company ultimately disclosed. The allegation that because Feraudo was involved in the shutting down of Roy Kay in April 2001, he must have known about the problems at Roy Kay all along, amounts to little more than fraud by hindsight. As such, it fails to establish scienter. Regarding Feraudo's involvement in the merger negotiations, plaintiffs point to no specific negative information Feraudo obtained during those negotiations that contradicted any of the Company's public representations about Roy Kay.[14] See Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); San Leandro, 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."). Accordingly, plaintiffs have not pleaded any particularized facts that would suggest that Feraudo knew of or recklessly disre-

14. As defendants point out, it strains reason to infer that KeySpan learned of massive operational and financial problems at Roy Kay even before acquiring the company, yet continued with the acquisition anyway. The absence of any apparent economic rationale supporting plaintiffs' theory of the case weakens the inference of scienter. See Acito v. IMCERA Group, Inc., Nos. 92 Civ. 1472, 92 Cir. 7156(RO), 1993 WL 404144, at *3 (S.D.N.Y. Oct. 6, 1993) ("Plaintiffs also claim that it was fraudulent to inform the investing public that Cooper's Animal Health, which had been acquired by Pitman–Moore in 1989, would 'enhance' Pitman–Moore. There is absolutely nothing in the record to suggest that IMA did not believe that Cooper's could enhance Pitman, else why have acquired it."), aff'd, 47 F.3d 47 (1995).

garded the falsity of the Company's statements regarding Roy Kay.

■ Finally, plaintiffs' allegations of GAAP violations do not save their claim. It is well-established that alleged violations of accounting principles, without corresponding intent to defraud, are inactionable under the securities laws. *See Chill,* 101 F.3d at 270 ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); *see also, e.g., Stevelman,* 174 F.3d at 84. Plaintiffs have not established that the alleged violations of GAAP were committed with fraudulent intent, nor have they alleged facts from which the court could infer such intent. The absence of such facts distinguishes this case from the "accounting" cases plaintiffs cite, all of which, as defendants point out, involved either the defendants' departure from stated accounting procedures, or internal reports undermining the accuracy of publicly released reports, or both. *See* Def. Reply Mem. at 15 n. 12 (enumerating and distinguishing on these grounds the cases cited by plaintiffs).

■ In sum, plaintiffs have not pointed to any facts suggesting conscious misconduct or recklessness on the part of defendants. At most, the allegations that the Company and its senior officials should have discovered the ongoing problems at Roy Kay earlier constitute charges of mere negligence, which are inactionable under the securities laws. *See, e.g., The Limited, Inc., v. McCrory Corp.,* 683 F.Supp. 387, 394 (S.D.N.Y.1988) ("Even if Touche should have done more to attempt to uncover and disclose the alleged fraud, without factual allegations tending to establish knowledge of those practices on Touche's part, its failure [to make further inquiries does] not rise above the level of negligence, which is legally insufficient.")

(citation an internal quotation marks omitted).

## III. Plaintiffs' Claims under Sections 20(a) and 20A

■ In the absence of a primary violation of Section 10(b) or Rule 10b–5, plaintiffs cannot state a claim for controlling person liability under Section 20(a) of the Exchange Act, *see Salinger v. Projectavision, Inc.,* 972 F.Supp. 222, 235 (S.D.N.Y. 1997); *Rich v. Maidstone Fin., Inc.,* No. 98 Civ. 2569(DAB), 2001 WL 286757, at *11 (S.D.N.Y. Mar.23, 2001), or for insider trading under Section 20A. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 541 (3d Cir.1999); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir.1994). Accordingly, these claims are dismissed.

## IV. Leave to Replead

Although plaintiffs have not complied with the pleading standards for fraud under Rule 9(b) and the securities laws, they have nevertheless identified both a large, concentrated amount of insider trading, and significant operational problems at an affiliate resulting in a substantial charge to earnings. Whether or not plaintiffs can in good faith plead additional facts giving rise to a strong inference of scienter is an open question, but the court in its discretion will afford plaintiffs a final opportunity to try. On the other hand, plaintiffs may not amend their PUHCA-related allegations, which hinge on the alleged nondisclosure of information for which there was either no duty to disclose or that was in fact disclosed. Repleading these allegations would thus be futile.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Consolidated Class Action Complaint is granted, except inso-

**390**

far as defendants seek dismissal with prejudice. This latter request is granted in part: plaintiffs shall not be permitted to replead anything relating to the putative non-disclosure of the fact or the consequences of defendants' regulation under PUHCA, but shall be permitted to replead, if a good faith basis exists for doing so, the portions of the complaint addressed to the nondisclosure of operational and financial problems at Roy Kay, Inc. Any amended complaint shall be served and filed with the court within 21 days of this order. Plaintiffs' failure to do so will result in dismissal of the entire action with prejudice.

SO ORDERED.