**CITY OF BROCKTON RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**The SHAW GROUP INC., J.M. Bernhard Jr. and Robert L. Belk, Defendants.**

**No. 06 Civ. 8245(CM)(MHD).**

United States District Court, S.D. New York.

March 18, 2008.

Alan Ian Ellman, Christopher J. Keller, David J. Goldsmith, Ira A. Schochet, Jonathan Gardner, Labaton Sucharow, LLP, Andrei V. Rado, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Plaintiffs.

Steven Robert Paradise, Michael V. Rella, Vinson & Elkins L.L.P., for Defendants.

## DECISION AND ORDER GRANTING MOTION TO DISMISS

McMAHON, District Judge.

This is a securities class action brought on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of The Shaw Group ("Shaw" or the "Company") between January 6, 2006 and July 9, 2006, inclusive (the "putative class period"). Lead Plaintiffs City of Brockton Retirement System and Norfolk County Retirement System and Plaintiff City of Birmingham Retirement and Relief System (collectively, "plaintiffs") allege that Defendant Shaw, its

Chief Executive Officer, and its former Chief Executive Officer violated the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (the "Exchange Act"). Defendants move to dismiss the Amended Complaint for failure to state a claim under the heightened pleading standards set forth by Congress in the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4, as interpreted by the United States Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* —— U.S. ——, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The motion is granted.

### The Amended Complaint

Lead Plaintiff City of Brockton Retirement System ("Brockton") is a public pension system organized for the benefit of current and retired public employees of the city of Brockton, Massachusetts. Brockton purchased Shaw common stock during the putative class period and was allegedly damaged in connection with its purchases.

Lead Plaintiff Norfolk County Retirement System ("Norfolk") is a public pension system organized for the benefit of current and retired public employees of Norfolk County, Massachusetts. Norfolk purchased Shaw common stock during the putative class period and was allegedly damaged in connection with its purchases.

Plaintiff City of Birmingham Retirement and Relief System ("BRRS") is a public pension system organized for the benefit of current and retired public employees of the city of Birmingham, Alabama. BRRS purchased Shaw common stock during the putative class period and was allegedly damaged in connection with its purchases.

Defendant Shaw is a Louisiana corporation headquartered at 4171 Essen Lane, Baton Rouge, Louisiana. Shaw is an integrated provider of comprehensive technology, engineering, procurement, construction, maintenance, pipe fabrication and consulting services to the energy and chemical industries, and a leading provider of consulting, engineering, construction, remediation and facilities management services to the environmental, infrastructure and homeland securities markets. Shaw operates through four business segments: Energy & Chemicals (E & C), Maintenance, Environmental & Infrastructure (E & I) and Fabrication, Manufacturing & Distribution (F & M). (Am.Cplt.¶ 15.)

Defendant Bernhard served as Shaw's Chairman, President and Chief Executive Officer during the putative class period, which runs from January 6, 2006 through July 9, 2006. (Id.¶ 16.)

Defendant Belk served as Shaw's Chief Financial Officer and Senior Vice President for most of the putative class period; he ceased being Shaw's CFO on July 6, 2007, shortly before the end of the class period. (Id.¶ 17.)

The two individual defendants are alleged, by virtue of their positions in the Company, to have had access to confidential information about the Company's operations and financial condition, and to have participated in the drafting of the Company's public reports and statements. (Id. ¶¶ 19, 23, 24.) Plaintiffs contend that it is appropriate to treat the two defendants as a group for pleading purposes. (Id.¶ 21.)

Large-scale construction contracts represent a "core component" of Shaw's business. The Company's customer base includes federal agencies and federally owned entities, state and local government, Fortune 500 companies and other private sector clients. Shaw retains third party equipment manufacturers and subcontractors to complete a project. (Id.¶ 26.)

Shaw embarked on a strategy to grow the Company by acquiring the assets of Stone & Webster, Inc. in 2000. Despite the Company's growth, two confidential witnesses reported to plaintiffs' counsel

that Bernhard and Belk ran the company with close attention to all material details. (Id.¶ 32–33.)

Shaw generally utilizes the percentage-of-completion method of accounting, which allowed Shaw to recognize revenue and costs during the course of production. (Id.¶ 35.) Shaw recognizes revenue and costs when a project meets certain milestones, as set forth in the project contract. (Id.¶ 36.) If a change was required on a milestone project, Shaw would have to change its estimated costs for work on the project. (Id.) Thus, any change request had to be reviewed by the Project Controls group, which would determine whether a Design Change Authorization was necessary. (Id.) Once a DCA was issued, estimators would review the change and assign the number of additional hours of labor that would be required. (Id.) The process was tracked in a Microsoft Access database on the Shaw intranet. (Id.) Each milestone project had a scheduler, one of whose tasks was to compile and generate a monthly "CSR Report," which reported revenue versus cost for his/her project. (Id. ¶ 37.)

In early 2005, Shaw converted from Costpoint to JD Edwards accounting software, which was internally referred to as "Shawman." (Id.¶ 38.) Shaw allegedly had major conversion problems when it switched to Shawman. (Id.¶¶ 38, 39.) A third confidential witness—a temporary employee who had considerable experience with the JD Edwards system—advised plaintiffs' counsel that there were a number of errors in data transfer, and that employees in the accounting department—notably Shaw's Vice President of Finance (who is not a defendant)—did not understand the company's accounting standards. (Id.¶ 39.) Confidential Witness 3 also reported that Shaw "routinely recognized" revenue on milestone projects that were on hold (i.e., not progressing). (Id.¶ 40,) The

witness asserted that this was due, at least in part, to internal pressure to make the revenue look good for the bosses. (Id. ¶ 40.) The Amended Complaint does not identify who applied this internal pressure or plead any facts tending to show that the "bosses" knew that revenue was being made to "look[ ] good" for them. Confidential Witness 3 left her temporary job with the company in November 2005, prior to the inception of the putative class period.

On January 6, 2006, Shaw issued a press release and filed a Form 8–K announcing its first quarter financials. (Shaw was on an August 31 financial year, so the first quarter financials covered the three month period ending November 30, 2005.) Net income from continuing operations was reported at $33 million, or $0.41 per diluted share, on revenues of $1,138.1 million. (Id. ¶ 41.) In the press release that accompanied the announcement, Bernhard said the company was pleased with the Q1 revenues, which were attributable to the "significant amount of emergency response and disaster relief work that Shaw performed in the aftermath of Hurricanes Katrina and Rita." (Id.)

Also on January 6, 2006, Shaw filed its quarterly report on Form 10–Q with the SEC for its first fiscal quarter of 2006, ending on November 30, 2005 (the "1Q06 10–Q"). (Id.¶ 42.) The 1Q06 10–Q contained a Sarbanes–Oxley (SOX) certification, signed by both individual defendants. (Id.¶ 44.) In the SOX certification, Bernhard and Belk certified that the first quarter financials fairly presented the company's financial position, and that Shaw had established and maintained disclosure controls and internal controls over financial reporting to ensure that the first quarter financials were accurate. (Id.) A quarterly evaluation of disclosure controls and proce-

dures also appeared in the 1Q06 10–Q. (Id.¶ 43.)

The Amended Complaint does not allege that the Company ever reported any error in its first quarter financial statements or ever restated its first quarter revenues. Nonetheless, it alleges that the first quarter financials are materially false. (Id. ¶ 46.) In its brief in opposition to the motion to dismiss, plaintiffs do not contend that the first quarter financials were ever restated, but contend instead that the first quarter filings were false and materially misleading in that the SOX certification and related statements about the adequacy of the company's financial controls were wrong. (Pl.Opp.8–9.)

In January 2006, shortly after the release of the 1Q06 financials, a window for the sale of stock by insiders opened. On the first trading day of this window, January 9, 2006, defendant Belk sold 47,760 shares of Shaw stock, representing 38.7% of his existing shares and 11% of his stockholdings adjusted for his unvested and restricted shares (a measure that is customarily done in the Second Circuit). Belk recognized $1.5 million in proceeds from these sales. (Am.Cplt.¶ 102.) The last time Belk sold Shaw stock held by him prior to this sale was in January 2001. (Id.¶ 104.)

On April 10, 2006, Shaw filed and publicly announced its second quarter 2006 financials (for the period ending February 28, 2006). Net income for the three months was reported as $25.3 million, or $0.31 per diluted share, on revenues of $1,244.8 million. (Id.¶¶ 47–48) Again, the publicly filed documents included a quarterly evaluation of disclosure controls and procedures and a SOX certification signed by both Bernhard and Belk. (Id.¶¶ 50–52.)

Once the second quarter financials were released, a window for stock transactions by insiders again opened. This time, Bernhard sold 568,910 shares, representing 37.7% of his existing shares and 21% of his stockholdings adjusted for his unvested and restricted shares, for a total price of $17.8 million. (Id.¶ 102.) Bernhard made these sales in numerous sales involving small quantities of stock over a period five days beginning on April 24, 2006.

Prior to the sales listed above, the last time Bernhard had sold Shaw stock was July 2001. (Id.¶ 103)

Sometime prior to July 10, 2006, during the period when Shaw and its outside accountant, Ernst & Young, were working on the Company's third quarter financials, errors were discovered in the second quarter financials, the net effect of which was that net income for 2000 was found to be overstated by $3.5 million or $0.04 per diluted share. (Id.¶ 54.) Net income was restated to $21.8 million or $0.27 per diluted share. (Id.) This represented a 14% reduction in reported net income. Shaw announced this on July 10, 2006, and filed an amended 10–Q for the second quarter the same day. (Id.¶¶ 54–55.)

The revised 10–Q reported that the restatement resulted from two accounting errors. (Id.¶ 55.) The first was an overstatement of revenue related to a milestone project contract. (Id.) The overstatement resulted from a "clerical error in the computation of percent complete on one contract as of February 28, 2006." (Id.) This error occurred "because a key control, the review of the calculation, that would have detected the overstatement did not operate correctly." (Id.¶ 56.) What this means, in plain English, is that someone forgot to check the math, which allowed a simple arithmetic error (based, it turns out, on one faulty data entry) to go uncorrected, with consequent impact on the bottom line.

The second error resulted from the misapplication of the generally accepted accounting principle related to consolidation

accounting in Shaw's E & I segment. (Id. ¶ 55.) Shaw failed to account properly for a minority interest in one variable interest entity for which it was the primary beneficiary, and "appropriate accounting personnel" did not catch the mistake. (Id.¶ 56.)

Shaw's stock fell 14.25% in one day, from $25, 75 per share on July 7, 2006 to $22.08 per share on July 10, 2006 (the next trading day) on volume of 9.3 million shares, which is described as "unusually heavy." (Id.¶ 57)

In October 2006, Shaw—in response to comment letters received from the SEC related to Shaw's Form 10–K for the year ended August 31, 2006—issued a restatement of the Form 10–K. (Id.¶ 58.) Note 1 to the restated Form 10–K states that "the financial statements contained in our Original Form 10–K Filing should no longer be relied upon, and ... our earnings and press releases and similar communications should no longer be relied upon to the extent that they are related to our 2006 financial statements." (Id.¶ 58.) Note 1 listed a number of changes made to previously issued financial statements. (Id. ¶ 59.) In addition, Ernst & Young issued an independent auditor's report, dated October 27, 2006, which stated that management had identified "material weaknesses" in Shaw's internal controls in the following respects:

> (1) controls to determine the initially recognized measurement date for stock options issued in 2000 did not detect during the financial statement close process that all criteria for a measurement date had not been met;
>
> (2) a calculation error in revenue recognition for a contract whereby an input error in a contract worksheet was not detected in the financial statement close process resulted in the restatement of prior periods; and
>
> (3) a misapplication of FASB Interpretation No. 46(R) concerning the minority

interest of a consolidated entity resulted in a restatement of prior periods.

(Id.¶ 60.) Items (2) and (3) identified by E & Y were the matters corrected in the July 9 announcement, and Item (1) was corrected in the revised 10–K. (Id.¶ 60.) Fairly read, E & Y confirmed that the matters relating to the second quarter financials involved (1) a one-time arithmetic error, resulting from someone's copying a number incorrectly, that was not caught; and (2) a misapplication of a single FASB interpretation. The other matter involved six year old stock options and did not desult in any adjustment to Shaw's financial statements.

Subsequent to its report dated October 27, 2006, E & Y identified additional material weaknesses, including "a lack of emphasis on internal controls and procedures and ... inadequate communication of project concerns on a timely basis;" "insufficient design and policies and procedures to ensure reasonable estimates" on E & C contracts worth less than $50 million; and "insufficient accounting resources to properly analyze", record and disclose accounting matters that caused the restatement of the Company's consolidated statements of cash flows and certain disclosure included in the accompanying Form 10–K/A for the year ended August 31, 2006. (Id.¶ 61.)

The Amended Complaint alleges that these errors associated with material weaknesses—some of which involved restatement of various financial amounts from 2000–2005—were larger than the errors that were reported and corrected during the putative class period relating to the second quarter 2006, and that they "must be considered in determining the degree to which the financial statements for the second quarter of 2006 were misstated." (Id. ¶ 62.) However, the Amended Complaint does not allege that these matters led to any further correction to Shaw's first or

second quarter 2006 financial statements. Indeed, in Shaw's 2006 Form 10–K/A, which is referenced in the Amended Complaint at ¶ 64, the Company specifically states, "We have not amended, and do not intend to amend, ... our previously filed Quarterly Reports on Form 10–Q for the period prior to August 31, 2006." No allegation in the pleading suggests that any such restatement should have been made but was not.

In a Form 8–K dated February 12, 2007, Shaw reported that E & Y had resigned as its outside auditor. (Id.¶ 63.) The Amended Complaint omits to state that E & Y filed an Item 304 letter (the letter required of a resigning auditor under Item 304 of SEC Regulation S–K, regarding changes in auditors), which was attached to the February 12 Form 8–K. In this letter, E & Y specifically agrees with the Company's statement that there were no disagreements between the Company and E & Y on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure in the fiscal years ending August 31, 2005 and 2006. (Paradise Supp. Decl. Ex. H at 2.)

Finally, plaintiffs allege that the lack of internal controls was a pervasive problem throughout the Company. Based on several statements by confidential witnesses, plaintiffs allege that there was widespread knowledge of this problem. Specifically, plaintiff points to the following statements:

1. Confidential Witness 4, who was employed by Shaw from February 2006 to March 31, 2007 in Benefits Accounting at the Baton Rouge headquarters, stated that there were no controls in place in the department when starting employment at Shaw in February 2006. (Id.¶ 89.) According to this witness, "[I]t was a running joke at Shaw that our accounting department sucks." (Id.)

2. Confidential Witness 5, a former Shaw Vice President and Business Development Manager in Alexandria, Virginia, from March 2006 to February 2007, noted that she was not surprised by the announcement of the restatement, and added that there were "so many things wrong with the company" and that colleagues noted that they "don't think we've seen the worst of it yet." (Id. ¶ 91.)

3. Confidential Witness 6, a former Estimator for Shaw from 2002 to August 2006, described the Company's accounting practices as "more aggressive than GAAP." (Id.¶ 92.)

4. Confidential Witness 7, a former Benefits Manager from February 2006 to May 2007, noted, "I've never been at a company that has restated as much as Shaw." (Id.¶ 93.)

5. Confidential Witness 8, an Engineer working in Project Controls and Estimations from 2005 to June 2007, noted that conversion to the Shawnet computer system "wreaked havoc" on the Company's ability to monitor its finances, particularly the ability to assess the overall construction and billing process. (Id. ¶ 94.)

6. Confidential Witness 9, a Project Controls employee from 2005 to January 28, 2007, noted that there was "a lot of confusion regarding the percent complete" method of accounting in the E & C division, and that the standard system purportedly used to track projects was not followed closely, leading to the inability to properly account for production. (Id.¶ 95.) He also said that it was widely known that project managers could "massage" the numbers to reap the rewards of hit-

ting high productivity and quick milestones. (Id.)

7. Confidential Witness 10, a Shaw Project Manager from 2005 to March 2007, noted that the accounting for percentage of completion contracts commonly contained errors, and that amended orders "were not carefully accounted for." (Id.¶ 96.)

8. Confidential Witness 11, a high-ranking director level employee from 2006 to June 2007, noted that Shaw could not estimate contracts well, and that the Company had problems with delivery. (Id.¶ 97.)

9. Confidential Witness 12, a former Master Scheduler and Planner on Shaw's Tennessee Valley Authority Project (the "TVA Project") from 2002 to May 2006, said that Shaw knew that there were accounting problems associated with the TVA Project, but did nothing. (Id.¶¶ 98–100.)

10. Confidential Witness 13, Shaw's former Director of Compensation and Benefits during 2005 through 2007, was not surprised by the restatement, because there were indicators of problems prior to the Company's restatement. (Id. ¶ 101.)

Plaintiffs do not allege that this "lack of controls" required any restatement of Shaw's financial statements, except as noted above.

**Share Prices**

As plaintiffs have called the Court's attention to numerous matters that occurred after the putative class period, it behooves me to make note of what was happening to Shaw's stock price during the months when the above-described post-class period disclosures about Shaw's accounting practices were being made, and when E & Y was resigning as outside auditor. The price of Shaw stock was rising steadily, with only one small blip (that came nowhere near the low for the last two years, reached on July 9, 2006). The stock price reached a high in the mid–70s by December 2007. It is presently trading in the low 60s. This lack of any negative impact on the price of Shaw stock from the various events that plaintiffs paint in such a negative light is doubtless why the putative class period is limited to the first six months of 2006.

**DISCUSSION**

As was true in another PSLRA motion to dismiss recently decided by this Court, *In re Top Tankers Securities Litigation,* 2007 WL 4563930 (S.D.N.Y. Dec.18, 2007), the only issue before me is whether the Amended Complaint has adequately alleged facts "giving rise to a strong inference" of scienter, or fraudulent intent. 15 U.S.C. § 78u–4(b)(2).

And as was true in *Top Tankers,* the only truly relevant case for assessing the viability of the scienter allegations in the corrected and amended complaint is *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* —— U.S. ——, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), the Supreme Court's most recent pronouncement about what a complaint must plead in order to survive such a motion.

In *Tellabs,* the class action complaint alleged that the company made a series of false statements about revenue and about the demand for the company's most popular products. When the company revealed that its projections were inaccurate, the share price dropped, and lawsuits inevitably followed. The Supreme Court, reversing the Seventh Circuit, remanded the case because the courts below did not consider whether the facts alleged in the pleading gave rise to a "strong" inference of scienter, rather than just a "plausible" inference of scienter. In the relevant ad-

dition to PSLRA jurisprudence, the Supreme Court announced that the "strength of inference" inquiry was "inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Tellabs*, 127 S.Ct. at 2510. District courts faced with PSLRA motions to dismiss were told to consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* We were further instructed that a complaint adequately pleaded scienter (that is, the inference of scienter could be deemed "strong") only if a reasonable person would deem the inference of scienter both "cogent" and "at least as likely as any plausible opposing inference." *Id.* at 2504–06, 2513.

■ The *Tellabs* decision also emphasizes that the inquiry is to be made in the context of a traditional motion to dismiss—assuming the well-pleaded facts of the complaint to be true—and that all the facts alleged, taken collectively, must be considered in deciding whether the pleading gives rise to a strong inference of scienter. Seizing on the "at least as likely" language, courts since *Tellabs* have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the "tie . . . goes to the plaintiff." *See, e.g., Sloman v. Presstek, Inc.,* 2007 WL 2740047, \*\*7–8, 2007 U.S. Dist. LEXIS 69475, at \*24–25 (D.N.H. Sept. 18, 2007).

### Disposition of the Motion

Applying *Tellabs'* "cogent and at least as likely as any competing inference" definition of "strong" to the Amended Complaint in this case leads me to the opposite conclusion to the one I reached in *Top Tankers:* the action should be dismissed.

■ In this Circuit, a plaintiff may plead a strong inference of scienter by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or that show the defendants had both the motive and the opportunity to commit the fraud. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

■ In this case, plaintiffs contend that a strong inference of scienter arises from allegations addressing both prongs of the *Shields* test—both "circumstantial evidence of conscious misbehavior or recklessness" and "motive and opportunity to commit the fraud." I will address each contention in turn.

Plaintiffs argue that the conscious misbehavior or recklessness prong of the *Shields* standard is satisfied by a confluence of five things: (1) the restatement of 2000 earnings and the disclosure of the failure of accounting controls that led to that restatement; (2) the fact that defendants were "hands on" executives who, as a result of their positions and management styles, either (i) had to know that the company's accounting controls were flawed and that earnings were overstated as a result, or (ii) were in a position to have that information by virtue of their access to internal company documents; (3) the widespread knowledge of problems with the company's accounting staff, as attested by confidential witnesses; (4) the post-class period disclosure of additional accounting control problems; and (5) the resignation of E & Y as Shaw's outside auditor.

Defendants point to considerable authority holding that none of these items, looked at discretely, is sufficient to support any inference of scienter, let alone a strong inference of scienter.

■ For example, it is well settled that mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter. *In re Bristol–Myers*

*Squibb Sec. Litig.*, 312 F.Supp.2d 549, 560 (S.D.N.Y.2004). This is the case that proves the rule. Although the putative class period begins on the day the company's *first* quarter earnings were announced, Shaw Group never restated its earnings for 1Q06, and there is no allegation of in the pleading of any accounting impropriety that was committed during the first quarter of 2006. Turning to the second quarter, when Shaw's earnings were restated, the *only* inference that one can draw from the well-pleaded facts of the complaint is that one of the two errors that led to the restatement was a simple arithmetic error—a mistake resulting from a mistaken data entry. That does "not constitute fraud." *Id.* at 569. Calling the failure to catch such a mistake a "failure of accounting controls" makes it sound sinister, but it does not change the fundamental nature of the "failure"—somebody entered the wrong number and forgot to check his/her work. This is not sinister at all. Mistakes like these happen a lot in the third grade, and sometimes they happen in public companies, too. There is no reason to make a federal case out of it.

The other error in Shaw's 2000 financials arose from the misapplication of FASB Interpretation No. 46(R) concerning the minority interest of a consolidated entity. It is equally well settled that a GAAP violation, without more, does not give rise to an inference of fraud. "Allegations of GAAP violations of accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of 'corresponding fraudulent intent' might they be sufficient." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000). The general allegation that, "knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company" does not give rise to the necessary inference of fraudu-

lent intent (scienter), in the absence of allegations of fact from which one could infer that the alleged accounting improprieties are either being committed by the officer or were reported to him. *In re NTL Inc. Sec. Litig.,* 347 F.Supp.2d 15, 33 (S.D.N.Y.2004); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3d Cir.1999). There is no such allegation in the Amended Complaint. While various confidential informants assert that knowledge of weaknesses in the accounting department was "widespread" at Shaw Group, not a single informant offers any information from which one could infer that either of the individual defendants knew or had reason to know anything about the mistaken application of FASB Interpretation 46(R)— except by virtue of their purported status as "hands on" senior executives. Nor are specific facts alleged tending to show that Messers. Bernhard and Belkin "deliberately shut their eyes" to this discrete issue. Plaintiffs do not plead that these individuals had access to particular, identified internal reports that would have alerted them to a deliberate (and hence fraudulent) misapplication of the rule. *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir.2001). Indeed, plaintiffs specifically allege that the errors in the 2000 financials were not detected until work was being done on the 3Q06 financials, which was long after defendants had disclosed Shaw's second quarter financials.

It is not enough for a post-*Tellabs* plaintiff to allege that, because executives like the Individual Defendants were "closely involved" in Shaw's business, one can strongly infer that they "were furnished with financial data which contained the 'errors' that later required restatement." (Pl. Br. at 17). The issue is not whether they were furnished with the erroneous financial data; the issue is whether, *prior to the issuance of the 2000 financials,* Bernhard and Belk were furnished with information that would have allowed them

to discern that the financial data was wrong. Nothing remotely like that is alleged in the amended pleading.

Next, plaintiffs argue that E & Y identified numerous additional accounting deficiencies after the putative class period—some of which resulted in restatement of Shaw Group's earnings going for years prior to the putative class period. And they assert, based on information given to it by confidential informants, that knowledge of the weakness of the company's accounting personnel was widespread in the company.

I disagree with the Seventh Circuit's suggestion, contained in *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir.2007), that information in securities fraud pleadings from confidential witnesses should always be discounted. However, in this case, the confidential informants give no information that gives rise to any inference of fraud. All they told plaintiffs' counsel was that Defendant Belk was "very hands on" with "a close reign on budgets" (Am.Cplt.¶ 33), and that Defendant Bernhard ran the Company "as his own sanctum." (Id.¶ 33.) None of this places information about the accounting improprieties that led to restatement of the 2000 financial statements in the hands of Bernhard and Belk prior to the time those statements issued—or, for that matter, counters the equally (if not more) plausible inference that those two "improprieties" were nothing more than mistakes.

Nor can plaintiffs take pleading comfort from the allegation that defendants' purportedly inaccurate Sarbanes–Oxley ("SOX") certification gives rise to support a strong inference that they were reckless in their original computation of first and second quarter earnings. *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 447–48 (S.D.N.Y.2005); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265–66 (11th Cir. 2006). It may not be prudent as a business matter to have an accounting department that has a hard time keeping up with new information technology, but it is not a violation of the federal securities laws to do so.

Equally important, the additional accounting issues identified by E & Y are not alleged to have resulted in any further restatement of Shaw's earnings for the two quarters encompassed by the putative class period. Thus, they did not give rise to any injury to the purported class.

Finally, plaintiffs plead that E & Y resigned as Shaw Group's outside auditor after this incident. It was the unexplained resignation of E & Y as the outside auditor that led this court to deny the motion to dismiss in *Top Tankers, supra,* 528 F.Supp.2d 408.

However, there is a major difference between *Top Tankers* and this case. In *Top Tankers,* the complaint contained allegations (which, because they were taken from materials prepared by the defendant itself, were strongly probative) that E & Y and Top Tankers had significant differences over a key issue of accounting treatment prior to the time of E & Y's resignation. Because E & Y was not required to file a resigning auditor's letter with the SEC pursuant to Item 304 of Regulation S–K (as Top Tankers was a foreign issuer), nothing in the record clarified why E & Y had resigned. The Amended Complaint in this case, by contrast, quotes a Form 8–K dated February 12, 2007, in which the Company states that E & Y has resigned as the Company's independent accounting firm, but conveniently fails to note that E & Y filed an Item 304 letter—as was required by Regulation S–K, since Shaw Group is a domestic issuer—which was attached to the February 12 Form 8–K. In this letter, E & Y specifically agrees with the Company's statement that there were no disagreements between the Company and E & Y on any matter of accounting

principles or practices, financial statement disclosure or auditing scope or procedure in the fiscal years ending August 31, 2005 and 2006. (Paradise Supp. Decl. Ex. H at 2.) Fortunately, on a motion to dismiss for failure to state a claim, the Court can take notice of the contents of documents that are referenced in the complaint, *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000); *San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Companies,* 75 F.3d 801, 808 (2d Cir.1996), so plaintiffs cannot avoid having the Court consider this disclaimer by artfully failing to plead it. Given E & Y's disclaimer, no inference of fraud or scienter can be drawn from E & Y's resignation in this case.

So none of the matters cited by plaintiffs admits of an inference of fraud. Plaintiffs argue, however, that zero plus zero plus zero plus zero plus zero adds up to something. In this, its arithmetic is as faulty as Shaw Group's was.

For the proposition that this is amalgam of suggestions is sufficient to plead scienter, plaintiffs cite a pre-*Tellabs* case from this Circuit, *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000). But the facts in *Novak* were radically different than the facts at bar. In *Novak,* defendants allegedly knew that they were violating the company's internal inventory control policies. Here, by contrast, any similar allegation is purely conclusory, and not supported by an allegation of fact.

Moreover, after *Tellabs,* any inference of *Novak* scienter to be drawn from the allegations of the complaint must be both "cogent" and "at least as compelling" as any non-culpable inference that defendant suggests could be drawn from the facts. "Cogent" means "compelling or convincing." BLACK'S LAW DICTIONARY 252 (7th ed.1999). No fact or facts alleged in the Amended Complaint compels the inference that plaintiffs would have the Court draw— namely, that defendants were reckless in choosing to recognize this contingent future income as part of the total book gain. Nor is that inference as compelling as the competing inference, which is that defendants had no access to information that would have alerted them to the FASB error prior to the issuance of the 2000 financials.

In the alternative, plaintiffs allege that defendants Bernhard and Belk had the motive and opportunity to commit fraud, citing personal stock sales.

Belk's alleged stock sales occurred immediately after the issuance of the 1Q06 financial statements. Those financial statements are not alleged to have been false or misleading. They were never restated. Belk sold his stock before any alleged misrepresentations were made. Therefore, any claim that Belk had the motive and opportunity to commit fraud is clearly specious.

Bernhard sold stock in the window for executive sales that opened after the issuance of the 2000 financial statements. These were Bernhard's first stock sales since 2001.

■ If the mere fact of significant stock sales following the issuance of an erroneous financial report were sufficient to raise an inference of motive and opportunity, Bernhard's sales would be enough. However, the facts relating to the stock sales rebut any inference of fraud. Bernhard did not sell his stock at the end of the putative class period, when insiders would have "rushed to cash out" before the financial statements were restated. *In re BI-SYS Sec. Litig.,* 397 F.Supp.2d 430, 444–45 (S.D.N.Y.2005). Mr. Bernhard sold his shares during April, more than ten weeks before the end of the putative class period. The 10–plus week gap between the defendants' sales and the Company's disclosure of accounting problems is not strongly suspicious. *See In re Keyspan Corp. Securities Litig.,* 383 F.Supp.2d 358, 385

(E.D.N.Y.2003). Furthermore, Shaw's stock price rose shortly after the insider stock sales, which further rebuts plaintiffs' purported motive and opportunity allegations. *Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001).

In the absence of other surrounding circumstances rendering January and/or April 2006 a particularly propitious moment for defendants to sell their shares, the Court cannot draw a strong inference of scienter from these sales. *In re Keyspan Corp. Securities Litig.,* 383 F.Supp.2d at 386.

## CONCLUSION

Because the amended complaint does not raise a strong inference of scienter, it is dismissed, with prejudice.